J-A20041-20
J-A20042-20
J-A20043-20
J-A20044-20

2021 PA Super 41

| | | |
|---|---|---|
| IN RE: S.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: ALLEGHENY COUNTY OFFICE OF CHILDREN, YOUTH AND FAMILIES | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 242 WDA 2020 |

Appeal from the Order Entered January 21, 2020
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000093-2019

IN THE INTEREST OF: S.R.C, A MINOR          IN THE SUPERIOR COURT OF
                                            PENNSYLVANIA

APPEAL OF: ALLEGHENY COUNTY
OFFICE OF CHILDREN, YOUTH AND
FAMILIES

                                            No. 243 WDA 2020

Appeal from the Order Entered January 21, 2020
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000093-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: S.R.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.R.C., A/K/A S.C. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 244 WDA 2020 |

Appeal from the Order Entered January 21, 2020

J-A20041-20
J-A20042-20
J-A20043-20
J-A20044-20

In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000093-2019

| | | |
|---|---|---|
| IN RE: S.R.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.R.C.A/K/A S.C. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 245 WDA 2020 |

Appeal from the Order Entered January 21, 2020
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000093-2019

BEFORE: BOWES, J., OLSON, J., and MUSMANNO, J.

OPINION BY OLSON, J.:                    **FILED: MARCH 15, 2021**

Allegheny County Office of Children, Youth, and Families ("CYF") and KidsVoice appeal from the January 21, 2020 order denying CYF's petition for involuntary termination of parental rights ("termination petition") of J.C. ("Mother") and B.C. ("Father") (collectively, "Parents") to their dependent child, S.C., a male child born October 2017, ("S.C.") pursuant to Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938.[1] We vacate the January 21, 2020 order and remand the case with instructions.

_____

[1] A single termination petition was brought collectively as to Mother and Father, and a review of that petition demonstrates that the facts pertinent to this appeal are the same for both Mother and Father. ***See*** Petition for Involuntary Termination of Parental Rights, 5/15/19.

- 2 -

The trial court set forth the following:

[In November 2017, Parents] took [S.C.] to UPMC Children's Hospital of Pittsburgh ["CHP"] and reported that he was vomiting blood. Medical staff examined [S.C.] and diagnosed him with bucket handle fractures in both of his legs along with [injuries to the left and right side of the soft palate region of his mouth]. [Parents] were unable to provide a plausible explanation for [S.C.'s] injuries. Based on the nature of the injuries and [Parents'] lack of explanation, the case was referred to [CHP's] Child Advocacy Unit for concerns of child abuse. Dr. Adelaide Eichman, a physician who specializes in child abuse, examined [S.C.] based on this referral. After an examination, Dr. Eichman reported that [S.C.] also had bruising to both sides of his jaw and his lower back. [Parents] reported they had observed a bruise on [S.C.'s] leg "a few weeks ago" but were unaware of the bruising to the jaw and [lower] back. After the examination and consultation with [Parents], Dr. Eichman concluded that the injuries were diagnostic of physical child abuse. A referral was made to [CYF] based upon this diagnosis. [Parents] were interviewed by [CYF] and [they] could not provide a plausible explanation for the injuries. As a result, [CYF] sought and obtained an emergency custody authorization on November 22, 2017. [S.C.] was placed in the care of [his] paternal grandfather and paternal step-grandmother [collectively, "Grandparents"].

[CYF] filed a dependency petition alleging that [S.C.] was without proper parental care or control. An adjudicatory hearing was held on December [19], 2017[,] and [S.C.] was adjudicated dependent. The [trial] court ordered that [S.C.] remain in foster[-]care placement with [Grandparents]. The [trial] court ordered Mother and Father to participate in parenting classes and non-offenders' treatment. They were also ordered to complete a psychological evaluation and follow any recommendations. Additionally, Mother was ordered to undergo a mental health evaluation and to follow all treatment recommendations.

Dr. [Terry O'Hara, PhD, a licensed psychologist,] was assigned to conduct psychological evaluations of the family. He conducted his first set of evaluations on February [19,] 2018, which consisted of interactional and individual evaluations of [Parents]. [S.C.] slept through most of the interactional evaluation. When [S.C.] did

- 3 -

wake up, [Parents] were able to sooth him. Dr. O'Hara opined that they exhibited several positive parenting skills. Neither parent could provide a plausible explanation about the cause of [S.C.'s] injuries. Mother reported that the injuries could have occurred when they were changing [S.C.'s] diaper. She reported that [S.C.] "arched his back and tried to twist" during diapering and that they had to hold him by both ankles. With respect to the [injuries] in [S.C.'s] mouth, Mother reported that she may have microwaved his bottle too long. During her individual evaluation, Mother reported a history of physical and sexual abuse by her biological father. She reported this abuse to her mother when she was approximately 20 years old. Her father was arrested and convicted of the abuse. She began mental health treatment after her father's arrest. She reported being prescribed medication for anxiety during that time. Dr. O'Hara performed psychological testing of Mother and noted that she was defensive. As such, he was limited in making an appropriate diagnosis. During the individual evaluation of Father, [Dr. O'Hara] did not endorse any mental health concerns. When asked about the injuries that [S.C.] sustained, Father reported that [S.C.] "would squirm a lot, then we would both hold him and secure his thighs". Father did not report any mental health concerns and was not defensive during any of the testing.

Trial Court Opinion, 4/24/20, at 2-4 (extraneous capitalization omitted). On February 4, 2019, Parents pleaded guilty to one count each of endangering the welfare of a child as a result of S.C.'s injuries and were sentenced to a period of probation.[2] *Id.* at 7.

On May 15, 2019, CYF filed a termination petition asking the trial court to terminate Mother's and Father's parental rights to S.C. pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (a)(5), (a)(8), and (b). *See* Petition for Involuntary

---

[2] 18 Pa.C.S.A. § 4304(a)(1).

Termination of Parental Rights, 5/15/19, at ¶¶13-14. Courtney Potter, Esquire, from KidsVoice, represented the legal and best interests of S.C. Max C. Feldman, Esquire, represented Parents, and CYF was represented by Melaniesha L. J. Abernathy, Esquire. A termination hearing was held on December 6, 2019, at which the aforementioned counsel, as well as Parents, participated.

On January 21, 2020, the trial court denied CYF's termination petition, finding that with regard to both Mother and Father, CYF failed to meet its burden of proof under Sections 2511(a)(2), (a)(5) and (a)(8) of the Adoption Act. Trial Court Order, 1/21/20. The trial court further found that involuntary termination of Mother's and Father's parental rights did not serve the needs and welfare of S.C. pursuant to Section 2511(b). *Id.*

On February 20, 2020, both CYF and KidsVoice filed separate notices of appeal of the January 21, 2020 order as it pertained to Mother and separate notices of appeal of the January 21, 2020 order as it pertained to Father pursuant to Pa.R.A.P. 1925(a)(2)(i) (providing that, concise statements of errors complained of on appeal shall be filed and served with notices of appeal in children's fast-track cases).[3] The trial court subsequently filed its Rule 1925(a) opinion on April 24, 2020.

_____

[3] CYF's separate, but otherwise identical, appeals challenging the trial court's order denying the termination petition as it pertained to Father and Mother

J-A20041-20
J-A20042-20
J-A20043-20
J-A20044-20

CYF raises the following issues for our review:

[1.]  Did [CYF] prove, by clear and convincing evidence, the grounds for the involuntary termination of Father's [and Mother's] parental rights to [S.C.] pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (a)(5), and (a)(8)?

[2.]  Did [CYF] prove, by clear and convincing evidence, that the involuntary termination of Father's [and Mother's] parental rights to [S.C.] best serves the needs and welfare of [S.C.] pursuant to 23 Pa.C.S.A. § 2511(b)?

[3.]  Did the trial court err as a matter of law and/or abuse its [discretion] when the trial court partially denied CYF's motion to strike [as] untimely [Parents'] pre-trial statement and permitted testimony of Holy Family visit[ation] coach, Amy Richter, and A Second Chance[,] Inc. family services technician, Dawn Heiser?

CYF's Brief at 5-6 (extraneous capitalization omitted).[4]

KidsVoice raises the following issues for our review:

[1.]  Whether the trial court erred and/or abused its discretion by denying CYF's petition to terminate [Mother's and Father's] parental rights to [S.C. pursuant to] 23 Pa.C.S.[A.] § 2511(a)(2), [(a)](5), and [(a)](8), where [S.C.] incurred

_____

were docketed by this Court at 242 WDA 2020 and 243 WDA 2020, respectively. KidsVoice's separate, but otherwise identical, appeals challenging the trial court's order denying the termination petition as it pertained to Mother and Father were docketed by this Court at 244 WDA 2020 and 245 WDA 2020, respectively. In a *per curiam* order, this Court ordered that the aforementioned four appeals be listed consecutively before a single merits panel. *See Per Curiam* Order, 2/26/20. We consolidate these appeals for purpose of disposition.

[4] CYF raises identical issues in its appeals pertaining to Father (242 WDA 2020) and Mother (243 WDA 2020). We reproduce these issues *in tandem* and address them collectively as to both Father and Mother.

- 6 -

physical abuse in [Parents'] care when he was only six weeks old; [Mother and Father, each,] pleaded guilty to [] endangering [the] welfare of [S.C.]; [Mother and Father] refused to take any responsibility for [S.C.'s] injuries; [S.C.] remains in foster care after two years; and [Mother and Father were] found to be minimally compliant with [their] permanency plan just three weeks before the contested termination hearing?

[2.] Whether the trial court erred and/or abused its discretion by finding that termination [of parental rights] does not [best] serve [S.C.'s] needs and welfare under 23 Pa.C.S.[A.] § 2511(b) where [S.C.] sustained significant physical injuries at six weeks of age when he was in the care of [Parents]; was removed from [Parents'] care at age six weeks and has remained in the care of [Grandparents] ever since; shows signs of secure attachment to [Grandparents]; and has only had supervised contact with [Parents] since he was removed?

KidsVoice Brief at 5.[5]

In matters involving involuntary termination of parental rights, our standard of review is well-settled.

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re [] S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If

---

[5] KidsVoice raises identical issues in its appeals pertaining to Mother (244 WDA 2020) and Father (245 WDA 2020). We reproduce these issues *in tandem* and address them collectively as to both Mother and Father.

Moreover, because CYF's and KidsVoice's first and second issues raise the same challenges to the trial court's denial of the termination petition, namely that the trial court erred in finding CYF did not satisfy its burden of proof pursuant to Section 2511(a)(2), (a)(5), (a)(8), and (b), we address each parties' issues *in tandem*.

the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (original brackets omitted). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re B.J.Z.*, 207 A.3d 914, 921 (Pa. Super. 2019) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, which requires a bifurcated analysis of the grounds for termination followed by an assessment of the needs and welfare of the child.

Our case law has made clear that under Section 2511, the [trial] court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). **Only if** the [trial] court determines that the parent's conduct warrants termination of his or her parental rights does the [trial] court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the

- 8 -

standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

**B.J.Z.**, 207 A.3d at 921 (citation omitted, emphasis added). We have defined clear and convincing evidence as that which is "so clear, direct, weighty, and convincing as to enable the trier[-]of[-]fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **In re Z.P.**, 994 A.2d 1108, 1116 (Pa. Super. 2010) (citation omitted). A child has a right to a stable, safe, and healthy environment in which to grow, and the "child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." **In re I.J.**, 972 A.2d 5, 9 (Pa. Super. 2009).

Here, CYF and KidsVoice appeal the trial court's determination under Sections 2511(a)(2), (a)(5), and (a)(8). Sections 2511(a)(2), (a)(5), and (a)(8) provide as follows:

### § 2511. Grounds for involuntary termination

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the

- 9 -

conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §§ 2511(a)(2), (a)(5), and (a)(8).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his [,or her,] physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re [] M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct.

- 10 -

> To the contrary, those grounds may include acts of refusal[,] as
> well as incapacity to perform parental duties." ***In re A.L.D.***, 797
> A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

***In re C.D.R.***, 111 A.3d 1212, 1216 (Pa. Super. 2015).

> Unlike subsection (a)(1), subsection (a)(2) does not emphasize a
> parent's refusal or failure to perform parental duties, but instead
> emphasizes the child's present and future need for essential
> parental care, control[,] or subsistence necessary for his physical
> or mental well-being. Therefore, the language in subsection
> (a)(2) should not be read to compel courts to ignore a child's need
> for a stable home and strong, continuous parental ties, which the
> policy of restraint in state intervention is intended to protect. This
> is particularly so where disruption of the family has already
> occurred and there is no reasonable prospect for reuniting it.

***Z.P.***, 994 A.2d at 1117 (citation omitted). "[W]hen a parent has demonstrated a continued inability to conduct his[, or her] life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified." ***Id.*** at 1118 (citation omitted). "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." ***Id.*** (citation and original quotation marks omitted).

"Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to

exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *Id.*

> To terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the [child's] removal by the [trial] court. Once the 12-month period has been established, the [trial] court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the [a]gency supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the [trial] court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of [a]gency services.

*Id.* (original quotation marks, original brackets, and some citations omitted).

Section 2511, in "permitting the termination of parental rights[,] outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have his[, or her,] parental rights terminated." *Id.* (citation and original quotation marks omitted).

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his[, or her,] ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and

must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with the child's physical and emotional needs.

*Id.* at 1119. (citation and original brackets omitted).

We begin our analysis by identifying the precise basis for the trial court's refusal to terminate parental rights. The order denying the termination petition stated, "[CYF] has not met its burden of proof by clear and convincing evidence that grounds exist for termination of parental rights" of both Mother and Father. Trial Court Order, 1/21/20. Despite having found that CYF failed to establish grounds for the involuntary termination of parental rights under Section 2511(a), the trial court, nonetheless, proceeded to find that termination of parental rights "does not serve the needs and welfare of the child" pursuant to Section 2511(b). *Id.* This apparent inconsistency carried over to the trial court's Rule 1925(a) opinion, which stated:

Based upon the evidence presented, [the trial] court found that [CYF] met its burden as it related to 23 Pa.C.S.A. § 2511(a)(2) only. "Subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control [or] subsistence necessary for his physical and mental well-being". *In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008). "Parents are required to make diligent efforts towards the reasonabl[y] prompt assumption of full parental responsibilities. A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous". *In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002). [Here, S.C.]

came into [CYF's] care after he suffered serious injuries [while] in the care of [Parents]. [Parents] and the maternal grandmother were the only caregivers for [S.C.] at the time he sustained these injuries. Despite pleading guilty to criminal charges relating [to] these injuries, [Parents] have never taken responsibility for causing the injuries. As Dr. O'Hara noted, "there is no way to address any sort of underlying issue that would have contributed to these injuries without anyone acknowledging what has happened". Without a plausible explanation, there is no way to ensure that [S.C.'s] present and future need for essential parental care, control or subsistence necessary for his physical and mental well-being will be met.

Trial Court Opinion, 4/24/20, at 11-12 (extraneous capitalization omitted).

It is well-settled under Pennsylvania law that the trial court's analysis under Section 2511(b) is only necessary **if** grounds for termination exist under Section 2511(a). **See B.J.Z.**, 207 A.3d at 921 (stating, "[o]nly if the [trial] court determines that the parent's conduct warrants termination of his or her parental rights does the [trial] court engage in the second part of the analysis pursuant to Section 2511(b)"). Because the trial court in the case *sub judice* analyzed the needs and welfare of S.C. pursuant to Section 2511(b), it logically follows that the trial court found that CYF met its burden of proof under Section 2511(a)(2) as expressed in its Rule 1925(a) opinion. CYF and KidsVoice agree that the trial court properly determined that CYF met its burden of proof for termination of both Mother's and Father's parental rights pursuant to Section 2511(a)(2). **See** CYF's Brief at 21-22; **see also** KidsVoice's Brief at 41-42.

"This Court need only agree with the trial court's decision as to any one subsection [of Section 2511(a)] in order to affirm the termination of parental rights." *In re A.S.*, 11 A.3d 473, 478 (Pa. Super. 2010) (citation, original brackets, and original quotation marks omitted). Accordingly, we focus our review in the case *sub judice* on Section 2511(a)(2).

Here, a review of the termination petition reveals that CYF became involved with Parents in November 2017, over concerns that S.C., a six-week-old infant, sustained serious physical injuries synonymous with child abuse. *See* Petition for Involuntary Termination of Parental Rights, 5/15/19, at ¶8. Dr. Eichman, an expert in pediatric medicine with a specialty in child abuse, diagnosed S.C.'s injuries during an examination at CHP on November 20, 2017. N.T., 12/6/19, at 173. Parents took S.C. to CHP the preceding day after discovering that S.C. was vomiting blood. *Id.* at 173 and CYF Exhibit 6. Upon her examination of S.C., Dr. Eichman stated that S.C. suffered injuries inside his mouth due to trauma, fractures of both his legs, and bruising to both sides of his jaw and his lower back. *Id.* at 171, 173-174; *see also id.* at CYF Exhibit 6 (stating, S.C. suffered acute bucket-handle fractures of both legs compatible with non-accidental trauma and, in and of themselves, nearly diagnostic of physical child abuse). S.C. at the time of the evaluation was six weeks old. *Id.* at 180. Dr. Eichman reported that, Parents "denie[d] trauma to [S.C.] but [they] wondered whether [S.C.'s] leg fractures could have been sustained during a diaper change." *Id.* at 174. Dr. Eichman stated that,

Parents' explanations "did not account for [S.C.'s] injuries, and there was no acknowledgement on the part of [Parents] of abuse or causation." *Id.* at 187. Dr. Eichman's medical diagnosis, given to a reasonable degree of medical certainty, was that S.C. was "the victim of physical child abuse." *Id.* at 176, 180. Dr. Eichman proffered that due to the history of a bruise on S.C.'s leg from several weeks prior, Dr. Eichman was "very concerned that [S.C.] had been abused more than once." *Id.* at CYF Exhibit 6. When asked about the pain S.C. suffered due to the abuse, Dr. Eichman stated that at the time the fractures to both of S.C.'s legs occurred, S.C. would have suffered "substantial pain." *Id.* at 176. The injuries to S.C.'s mouth and the bruising on his jawline and lower back also would have caused S.C. pain. *Id.* Dr. Eichman opined that generally speaking, when a child has been physically abused and there is no explanation for the abuse, there is concern that without some sort of intervention, and if the violence goes unchecked, the violence would escalate and the child could sustain worsening injuries during subsequent episodes of abuse. *Id.* at 180.

CYF obtained emergency custody of S.C. because S.C.'s safety could not be ensured while in the care of Parents due to Parents' refusal to provide a plausible explanation as to the causation of S.C.'s injuries. *See* Petition for Involuntary Termination of Parental Rights, 5/15/19, at ¶10. On February 4, 2019, Parents pleaded guilty to one count each of endangering the welfare of a child, S.C. *Id.* at CYF Exhibits 3 and 4. Parents' convictions stemmed from

the significant injuries S.C. sustained, the causation of which Parents were unable to explain. *Id.* Since his removal from Parents' care, S.C. has remained in placement because both Mother and Father failed to successfully complete the goals established in a Family Plan and as ordered by the trial court, including, *inter alia*, participation in anger management counseling. *See* Petition for Involuntary Termination of Parental Rights, 5/15/19, at ¶¶9-12.

The CYF case supervisor stated that CYF continued to have concerns about the safe parenting of S.C. because Parents did not provide an explanation of how S.C. sustained the significant injuries. N.T., 12/6/19, at 33, 41, 49-50. Due to CYF's concerns, neither Mother nor Father has had unsupervised visitation of S.C. since S.C. was removed from their care. *Id.* at 48, 52. CYF observed that S.C. is "very comfortable" living with Grandparents, and S.C. "seems very bonded to his caretakers." *Id.* at 53. Grandparents are nurturing of S.C., show him love, and meet his educational, psychological, and developmental needs. *Id.* When asked why the parental rights of Mother and Father should be terminated as to S.C., CYF explained,

> [S.C.] has been in [CYF] care for almost his entire life. He has been cared for appropriately by [Grandparents]. There has never been any plausible explanation given to [CYF] about how he sustained these very concerning injuries at such a young age, and [CYF] does not believe that there would be any way to safely reunify him with his parents and he deserves permanency.

*Id.* at 57-58.

- 17 -

Dr. O'Hara stated that, Mother reported "having no choice with respect" to pleading guilty to endangering the welfare of S.C. and denied ever endangering S.C. *Id.* at 196. Dr. O'Hara stated that Father pleaded guilty to endangering the welfare of S.C. and continued to provide no explanation of how S.C.'s injuries occurred and assumed no responsibility for the injuries. *Id.* at 199-200. Dr. O'Hara's foundational concern in the instant case was that there was no explanation provided as to how S.C. sustained the significant injuries. *Id.* at 196. Dr. O'Hara opined that, there is "no way to address any sort of underlying issue that would have contributed to [S.C.'s] injuries without [Parents] acknowledging" how the injuries occurred. *Id.* Parents' underlying issues, Dr. O'Hara explained, included anger management issues, low frustration tolerance, and impulsivity. *Id.* Dr. O'Hara stated that it is important for Parents to acknowledge responsibility for the abuse because it can then be determined if Parents are capable of making the necessary changes, *i.e.* seek the necessary treatment and develop the necessary parenting skills, to care for S.C. in the future. *Id.* at 201. The three factors that lead to child abuse, according to Dr. O'Hara, are (1) the inability to handle one's own presentation, (2) the inability to handle the child's presentation, and (3) the bond that exists between the caregiver and the child. *Id.* at 201-202. Dr. O'Hara expressed that, "it's important to acknowledge responsibility in these cases so that the actual issues that contributed to the injuries can be sufficiently addressed." *Id.* at 203. Dr. O'Hara conveyed a

- 18 -

great deal of concern over Parents' lack of prioritizing their anger management treatment and their continued lack of acknowledgement of responsibility for S.C.'s injuries or an explanation of how the injuries occurred. *Id.* at 204. The effectiveness of Parents' anger management treatment was limited, according to Dr. O'Hara, because neither Parent acknowledged any responsibility for S.C.'s injuries. *Id.* at 221. Dr. O'Hara proffered that, "[he] would have some level of concern about [Parents having] unsupervised contact [with S.C.,] especially if the anger management [treatment] hasn't been completed." *Id.* at 205. Dr. O'Hara recommended that Parents complete four to five months of weekly anger management treatment. *Id.* The executive director of Family Services of Beaver County testified that Parents completed a six-week anger management treatment program over the course of eight months and then returned for a few additional treatment sessions.[6] *Id.* at 134, 147. Dr. O'Hara stated that, in his opinion, neither Parent complied with the recommendations for anger management treatment. *Id.* at 206. To illustrate his concern, Dr. O'Hara explained that in his most recent evaluation of Mother, Mother stated

---

[6] The executive director testified that Mother participated in anger management treatment sessions on April 8, 2019, May 16, 2019, July 2, 2019, September 12, 2019, October 21, 2019, November 14, 2019, November 20, 2019, November 25, 2019, and December 2, 2019. N.T., 12/6/19, at 134, 147, and CYF Exhibit 5. She testified that Father participated in anger management treatment sessions on April 8, 2019, May 16, 2019, July 2, 2019, October 15, 2019, November 14, 2019, November 25, 2019, and December 2, 2019. N.T., 12/6/19, at 134, 147, and CYF Exhibit 5.

that, "[S.C.] will throw, hit hard, [and] his temperament is bad[.]" *Id.* at 229. Dr. O'Hara stated that he felt Mother's description of S.C. was "a huge mischaracterization" and revealed Mother's lack of comprehension of S.C.'s development and personality dynamics. *Id.* Dr. O'Hara explained that it was not uncommon for children within S.C.'s age group to demonstrate occasional periods of mild aggression and that he was concerned about Mother's characterization of S.C.'s temperament as "bad." *Id.*

Based upon a review of the record, we concur with the trial court that CYF satisfied its burden of proof under Section 2511(a)(2). CYF demonstrated with clear and convincing evidence that Parents repeatedly refused to provide a plausible explanation of or take responsibility for S.C.'s injuries and failed to complete anger management counseling. Parents' refusal to provide an explanation of the causation of the injuries, take responsibility for the injuries, or complete anger management counseling made it impossible to determine if Parents can provide a safe environment for S.C. Without an acknowledgement of causation, acceptance of responsibility, or completion of anger management treatment, Parents caused S.C. to be without essential parental care necessary for his physical and mental well-being, including, *inter alia*, providing a safe, secure, and nurturing environment in which to grow, and Parents' refusal to acknowledge causation, accept responsibility, or complete the recommended anger management treatment has not been remedied. Accordingly, we discern no error of law or abuse of discretion in

the trial court's termination of Mother's and Father's parental rights to S.C. pursuant to Section 2511(a)(2). ***See Z.P.***, 994 A.2d at 1118 (holding, termination of parental rights pursuant to Section 2511(a)(2) is justified when Parents continue to conduct their lives in a fashion that provides an unsafe environment for a child and parents refuse to remedy the behavior).

Once a trial court determines that involuntary termination of parental rights is warranted under Section 2511(a), the trial court must engage in an analysis pursuant to Section 2511(b) to determine whether termination is in the best interests of the child. Section 2511(b) of the Adoption Act states,

### § 2511. Grounds for involuntary termination

. . .

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

As this Court has explained, "Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered" as part of our analysis. ***In re K.K.R.-S.***, 958 A.2d 529, 533 (Pa. Super. 2008). "While a parent's emotional bond

- 21 -

with his or her child is a major aspect of the [Section] 2511(b) best[-]interest analysis, **it is nonetheless only one of many factors to be considered** by the [trial] court when determining what is in the best interest of the child." *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (*citing* **K.K.R.-S.**, 958 A.2d at 533-[5]36).

> In addition to a bond examination, the trial court can **equally emphasize the safety needs of the child**, and should **also consider the intangibles**, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court **should consider the importance of continuity of relationships** and whether any existing parent-child bond can be severed without detrimental effects on the child.

*C.D.R.*, 111 A.3d at 1219 (Pa. Super. 2015) (emphasis added, original brackets omitted); *see also In re J.N.M.*, 177 A.3d 937, 943-944 (Pa. Super. 2018) (stating, that in performing a best-interest analysis pursuant to Section 2511(b), the trial could should consider the parent-child bond, if any exists, the safety needs of the child, intangibles, such as love, comfort, security, and stability the child may have with the current caregiver, and the importance of continuing any relationship the child may have with the caregiver), *appeal denied*, 183 A.3d 979 (Pa. 2018).

Here, CYF argues that the trial court erred in denying the termination petition "because, while termination may prove detrimental to S.C., the harm is mitigated by his relationship with [Grandparents] and the safety that their home provides." CYF's Brief at 40. CYF contends that the trial court failed to properly consider the safety concerns if S.C. were returned to Parents' care, including, *inter alia*, that without Parents' acknowledgement of responsibility

or causation, the issues which lead to S.C.'s serious injuries remain unaddressed. *Id.* at 33-40. CYF submits that the trial court focused, instead, on the parent-child bond and did not consider S.C.'s safety. *Id.* at 33-40. CYF asserts that the trial court further failed to consider S.C.'s bond with Grandparents or the safe and nurturing environment Grandparents provided S.C. and "chastise[d Grandparents] for identifying successor caregivers" in the event they are unable to care of S.C. due to health considerations and advancing age. *Id.* at 35-38.

KidsVoice argues that while the record supports a finding that S.C. had a bond with Parents, the trial court erred in determining that maintaining this parent-child bond was necessary and beneficial. KidsVoice's Brief at 49. Rather, KidsVoice contends, "there is no evidence that termination would cause [S.C.] to suffer extreme emotional consequences" and S.C.'s secure relationship with Grandparents would mitigate the impact of termination. *Id.* at 49-50 (original quotation marks omitted). KidsVoice asserts that the trial court "notably failed to consider [the] safety concerns if [S.C.] were returned to the care of [Parents]." *Id.* at 52. KidsVoice submits that,

> Although the trial court rightly found that Mother and Father "have never taken responsibility for causing the injuries" to [S.C.] and accepted Dr. O'Hara's testimony that "there is no way to address any sort of underlying issue that would have contributed to these injuries without anyone acknowledging what has happened" in its analysis of grounds for termination under Section 2511(a)(2) of the Adoption Act, it failed to consider these facts in its needs and welfare analysis. Throughout his testimony, Dr. O'Hara expressed this "foundational concern," yet the trial court ignored it entirely.

*Id.* at 54-55 (record citation omitted).

In determining that CYF failed to demonstrate by clear and convincing evidence that the termination of parental rights was in S.C.'s best interest pursuant to Section 2511(b), the trial court recognized,

that the existence of a bond between a child and parent will not necessarily result in a denial of a termination petition. Once it has been determined that there is a bond, the [trial] court must conduct further analysis in order to ascertain the nature of the bond. Based upon the evidence presented, [the trial] court determined that [S.C.] has a necessary and beneficial bond with [Parents]. There has been no indication that the bond is an unhealthy or pathological one. With respect to attachment, Dr. O'Hara reported that [S.C.] "values" his relationship with [Parents] and has benefited from it. He reported that there were several indications that [S.C.] had a secure attachment with [Parents]. He opined that [S.C.] will suffer negative consequences if his relationship with [Parents] were to be severed. [Dr. O'Hara] also opined that [S.C.] demonstrated several cues that he had a secure attachment with [Grandparents]. Dr. O'Hara testified that there would be "a lot of positives" if [S.C.] was adopted by [Grandparents]. When asked about mitigating the negative consequences of termination, Dr. O'Hara concluded that there was literature to support [the] notion that children who experience security and attachment with at least one caregiver are able to handle stress better than those who do not. But he was unable to give an ultimate opinion about whether termination of Mother['s] and Father's parental rights would best suit the needs and welfare of [S.C.] The testimony of Dr. O'Hara gave the [trial] court pause as it was clear that [S.C.] would suffer psychological harm if he could not continue his relationship with [Parents]. Dr. O'Hara's contention that [S.C.] may be able to handle the stress better because he displayed indications of a secure bond with [Grandparents] was not compelling. The [trial] court had concerns about [Grandparents] being a long-term placement. They have already made arrangements for alternative caregivers should their health prohibit them from doing so[.]

- 24 -

Trial Court Opinion, 4/24/20, at 15-16.

A review of the trial court's analysis pursuant to Section 2511(b) demonstrates that the trial court failed to consider the safety needs of S.C., as well as the love, comfort, security, and stability Grandparents provide S.C., and the importance of continuing S.C.'s relationship with Grandparents. Instead, the trial court focused overwhelmingly on the parent-child bond. *See* Trial Court Opinion, 4/24/20, at 12-16 (stating, "[t]he best[-]interests analysis includes many factors that the court must consider[,] [m]ost notably, the bond that exists between the child and the parent"). While this Court does not minimize the importance of considering the bond a child shares with a parent, our case law makes clear that the parent-child bond, if one exists, is only one of many factors that must be considered by the trial court in determining whether termination of parental rights is in the child's best interest. *See C.D.R.*, 111 A.3d at 1219; *see also J.N.M.*, 177 A.3d at 943-944.

When asked about the bond S.C. exhibited with Parents and with Grandparents, Dr. O'Hara expressed that S.C. showed similar reactions to both sets of individuals (Parents and Grandparents) indicating that he had a similar attachment to each set of individuals.[7] *See* N.T., 12/6/19, at 209-211.

_____

[7] Dr. O'Hara explained that, a "bond refers to the relationship a caregiver has with a child [while an] attachment refers to the child's relationship with the caregiver." N.T., 12/6/19, at 209.

In demonstrating his attachment to Parents, as well as to Grandparents, S.C. smiled, laughed, was playful and interactive, and showed affection. *Id.* at 210. Dr. O'Hara expressed that there would be a detriment to S.C. if his relationship with any of the parties involved, Mother, Father, or Grandparents, was terminated, but a child who experiences security, such as the security that S.C. experienced with Grandparents, would be able to handle the stress better. *Id.* at 213-214, 243. Although Dr. O'Hara recognized that S.C. benefited from his attachment with Parents, Dr. O'Hara's foundational concern remained that S.C. "sustained substantial injury in [Parents'] care, and [there has] been no explanation as to what actually happened[.]" *Id.* at 214, 243. Dr. O'Hara, in making his recommendation as to the best interest of S.C., stated, "I do think that there would be benefit and advantages for [S.C.] if he were to be adopted by [Grandparents]." *Id.* at 215, 255-256.

This Court does not minimize the trial court's assessment that S.C. exhibited an attachment with both Mother and Father and that the parent-child bond must be considered in determining the needs and welfare of S.C. The record demonstrates that S.C. has a similar attachment with Mother, Father, and Grandparents, and that S.C. will suffer some detriment if any of these bonds are terminated. However, the parent-child bond, or caregiver-child bond, is only one factor of consideration. In the instant case, it is axiomatic that S.C.'s bond with Parents comes with limitations given that S.C. was removed from Parents' care at six weeks of age and had been in the care of

Grandparents for the past two years, with only supervised visitation with Parents. S.C.'s physical safety prompted his removal from the care and custody of Parents and the trial court abused its discretion and erred as a matter of law in failing to consider this factor in conducting its best-interest analysis. Dr. O'Hara expressed concerns about returning S.C. to Parents because Parents failed to acknowledge any responsibility for the significant injuries S.C. sustained or to provide a logical explanation regarding causation. Even after attending anger management treatment, albeit less than Dr. O'Hara's recommended treatment regimen, and after pleading guilty to endangering the welfare of S.C., neither Mother nor Father acknowledged responsibility for S.C.'s injuries or explained how S.C. suffered, *inter alia*, internal injuries to his mouth, bruising to his jawline and lower back, and fractures in both his legs, which were indicative of physical child abuse. Furthermore, the trial court erred in failing to consider the love, stability, and security provided to S.C. by Grandparents, who have cared for and nurtured S.C. from the time he was six weeks old.

When **all** essential best-interest factors are considered pursuant to Section 2511(b), CYF presented clear and convincing evidence that it was in S.C.'s best interest to terminate the parental rights of Mother and Father. Consequently, we vacate the trial court's order denying the termination

petition and remand this case with the instruction that the trial court enter an order terminating the parental rights of both Mother and Father.[8]

Order vacated. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/15/2021

---

[8] In light of our decision herein, we do not address CYF's final issue.