J-S11034-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.R.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1223 WDA 2021 |

Appeal from the Decree Entered September 16, 2021
In the Court of Common Pleas of Jefferson County
Orphans' Court at No(s): 32A-2021 O.C.

| | | |
|---|---|---|
| IN RE: J.D.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1225 WDA 2021 |

Appeal from the Decree Entered September 16, 2021
In the Court of Common Pleas of Jefferson County
Orphans' Court at No(s): 33A-2021 O.C.

BEFORE:  PANELLA, P.J., OLSON, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED:  June 29, 2022**

K.S. ("Mother") appeals from the decrees granting the petitions filed by the Jefferson County Children & Youth Services ("CYS" or the "Agency") to involuntarily terminate her parental rights to her daughter, J.R.S., born in December 2003, and son, J.D.S., born in July 2007 (collectively, "the

Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), (5), (8),

and (b).[1]  We affirm.

This Court previously set forth the factual and procedural background of

this case as follows:

> As a matter of background, [CYS] has been involved with this family since 2017.  On July 13, 2017, CYS filed dependency petitions and alleged that the Children were without proper parental care or control.  [*See*] 42 Pa.C.S.[A.] § 6302(1). Specifically, CYS received a report that indicated that the Children were physically fighting with one another, throwing things, and not listening to Mother.  Mother stated several times to a service provider that she could not handle the Children any longer and she wanted them out of her home.  On August 30, 2017, the trial court held a hearing on the dependency petitions.  In orders dated August 30, 2017, and entered on September 6, 2017, the trial court adjudicated the Children dependent.  The orders directed that the Children remain in their separate foster care placements. On June 27, 2018, the trial court ordered termination of court supervision, and reunified the Children with Mother and Father. However, CYS continued to receive multiple referrals regarding the family.
>
> On November 10, 2019, CYS received a report that J.[R.]S. returned home from the Meadows Psychiatric Center and resumed her previous behaviors of screaming, not listening, and refusing to follow instructions.  Mother and J.[R.]S. engaged in a verbal altercation that prompted the caseworker to call the police.  On November 12, 2019, the trial court granted CYS emergency protective custody of J.[R.]S., and she was placed in foster care. On December 5, 2019, J.[R.]S. was placed in a Group Home at Pathways Adolescent Center because her foster care placement was not able to manage [her] behaviors.  Mother and Father eventually ended their tumultuous relationship, and J.D.S. remained in Father's home.  On July 24, 2020, J.[R.]S. moved to a Group Home at Bethesda Lutheran Services because her

---

[1] The trial court also involuntarily terminated Father's parental rights to J.R.S. and J.D.S.  Father's appeals of those decrees are pending at separate docket numbers, and we address his appeals in a separate memorandum.

previous placement did not believe that J.[R.]S. would make any more progress with them. On September 17, 2020, J.[R.]S. moved to a Residential Treatment Facility at Perseus House-Andromeda House for her to receive the mental health services she requires.

On or about July 31, 2020, the trial court granted CYS emergency custody of J.D.S. due to lack of parental care and control in Father's home. [*See*] N.T., 9/23/20, at 5. At that time, Mother was incarcerated because she violated a [Protection From Abuse ("PFA")] order that Father filed against her. *Id*. at 20[,] 25. [Mother remained incarcerated until October 2020.] J.D.S. was placed in the same foster care home where he previously resided. On August 4, 2020, the trial court adjudicated J.D.S. dependent. On September 2, 2020, the trial court entered a no-contact order between Father and CYS because Father was continuously verbally abusive, harassing, and behaved inappropriately to all personnel assigned to assist the family in the home.

The trial court held an adjudication hearing on September 23, 2020. Rebecca Sallack, a caseworker for CYS, testified that the underlying basis for emergency custody of J.D.S. was due to the "continuous trauma that this child has dealt with over the course of his life." *Id*. at 29. More specifically, she testified that Father constantly "badmouthed" and made "inappropriate comments" about Mother, in front of J.D.S., to the home health nurse, to CYS and to service providers. *Id*. at 7. Ms. Sallack stated that Father was argumentative when asked if pest management could perform an evaluation after reports of a bed bug infestation of the home. *Id*. at 8. Ms. Sallack explained that Father "fought" CYS until "after multiple attempts he eventually gave in and said, Whatever, with an attitude, to have the home looked at . . .. [W]hen pest management did the evaluation, they found bed bugs in the home. [Father] then stated that [CYS] asked pest management to say there was [*sic*] bed bugs in the home." *Id*. Father was also argumentative regarding counseling for J.D.S. *Id*. at 9. Ms. Sallack stated that multiple service providers indicated that Father behaved inappropriately, was aggressive, and made them feel uncomfortable. *Id*. at 10-11. Ms. Sallack explained that Father was "constantly argumentative, belligerent, verbally aggressive, takes very little responsibility for his part of the kids being removed, [and] blames [Mother] for the majority of the issues." *Id*. at 12. Ms. Sallack recounted an

incident where Father choked J.[R.]S. and admitted that he told J.[R.]S. "she will have to be a little [f------] whore to keep a roof over her head." *Id*. at 13-14.

With regard to Mother, Ms. Sallack testified that there was an extensive history of Mother's aggressive behavior towards Father and the Children. *Id*. at 27. Notably, Ms. Sallack testified that a no-contact order was put in place between J.[R.]S. and Mother because "the phone calls [between them] were getting aggressive, and J.[R.]S.'s behaviors were increasing . . . she was fighting with peers, fighting with staff, threatening to harm herself, [and] threatening suicide." *Id*. at 17[,] 26. Ms. Sallack testified that chaos, noise, and arguments exacerbate symptoms of anxiety for J.[R.]S. *Id*. at 34. Ms. Sallack explained that J.[R.]S. should avoid conflicts and interactions with people who cannot manage their behaviors, and recommended a goal change for J.[R.]S. *Id*.

Ms. Sallack opined that the Children need a plan for permanency. *Id*. at 27. She explained, "[t]his has gone on entirely too long, and it's- - like I said, this is not something that's new. If you go back through the case record, and this fighting and this bickering and the police [being] called, this is years and years and years on these kids." *Id*. at 27.

On the record, at the conclusion of the September 23, 2020 hearing, the trial court stated it would change the Children's goals to adoption, and enter its orders on that same date. . . . Father and Mother filed timely notices of appeal . . ..

*In re J.S.*, 260 A.3d 102 (Pa. Super. 2021) (unpublished memorandum at **1-6). This Court affirmed the goal change orders. *See id*. (unpublished memorandum at *18).

Thereafter, the Agency filed petitions for the involuntary termination of Mother's and Father's parental rights to Children. The trial court conducted a hearing on September 2, 2021. Mother was present and represented by counsel. Father participated via telephone from Florida, where he had relocated, and was represented by counsel. Further, the Children were

represented by a guardian *ad litem* and court-appointed legal counsel. During the hearing, the Agency presented the testimony of Ms. Sallack. Mother and Father each testified on their own behalf. The guardian *ad litem* and legal counsel for the Children argued in favor of termination of parental rights. ***See*** N.T., 9/2/21, at 84-86.[2]

On September 16, 2021, the trial court entered decrees terminating Mother's parental rights. Mother filed timely notices of appeal, as well as concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). This Court *sua sponte* consolidated Mother's appeals. The trial court complied with Rule 1925(a).[3]

Mother raises the following issues for our review:

I. Whether the lower court erred in terminating Mother's parental rights under 23 Pa.C.S.A. [§ 2511](a)(2)[?]

II. Whether the lower court erred in terminating Mother's parental rights under 23 Pa.C.S.A. [§ 2511](a)(5)[?]

III. Whether the lower court erred in terminating Mother's parental rights under 23 Pa.C.S.A. [§ 2511](a)(8)[?]

Mother's Brief at 4.

Our standard of review of a decree involuntarily terminating parental rights is as follows:

---

[2] Although the trial court incorporated the dependency records into the termination proceedings, those records are not included in the certified record. However, this omission does not impair our review.

[3] In lieu of authoring a Pa.R.A.P. 1925(a) opinion, the trial court relied on its September 16, 2021 opinion explaining the basis for its decrees.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. [A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotation marks omitted). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003) (citation omitted).

The termination of parental rights is governed by section 2511 and requires the trial court to conduct a bifurcated analysis of the grounds for termination under subsection (a) followed by the consideration of the needs and welfare of the child under subsection (b). The initial focus is on the conduct of the parent. *See In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies one of the statutory grounds for termination delineated in section 2511(a). *Id*. Only if the court determines that the

parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b), relating to the needs and welfare of the child. *Id*. We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation omitted).

In the case *sub judice*, the trial court terminated Mother's parental rights to the Children pursuant to subsections 2511(a)(2), (5), (8), and (b).[4] Where, as here, the trial court determines that there are grounds for termination under more than one subsection of section 2511(a), we need only agree with the trial court's determination as to any one subsection in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004). Given this latitude, we analyze the court's termination decrees pursuant to subsection (a)(2), which provides as follows:

_____

[4] Mother has not raised any challenge related to the trial court's determinations under section 2511(b). Panels of this Court have sometimes relied on *In re C.L.G.*, 956 A.2d 999 (Pa. Super. 2008) (*en banc*), to address section 2511(b), even where the appellant has made no effort to present a challenge regarding that section. In *In re M.Z.T.M.W.*, 163 A.3d 462, 466 n.3 (Pa. Super. 2017), a panel of this Court concluded that *C.L.G.* does not require consideration of section 2511(b) in every appeal from a decree involuntarily terminating parental rights. *Id*. (concluding that because mother failed to include a challenge to section 2511(b) in her concise statement and statement of question involved, any challenge to that subsection was waived). Here, as Mother failed to preserve any challenge to subsection 2511(b), we need not address it.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

With regard to termination of parental rights pursuant to section 2511(a)(2), this Court has indicated:

> In order to terminate parental rights pursuant to [section] 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct and may include acts of refusal as well as incapacity to perform parental duties. *See In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021) (citation omitted). Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *See Matter of Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017). As such, a parent's vow to cooperate, after a

long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *See In re S.C.*, 247 A.3d at 1105.[5]

Mother argues that the incapacity and reason for removal resulting from the conflict between she and Father has been remedied as they are separated and intend to remain separated. Mother's Brief at 13. Mother asserts that the core of the family turmoil was the negative relationship between she and Father, and that this spilled over to tension and fighting between the parents and the Children, as well as between the Children themselves. *Id*. Mother acknowledges her need to continue therapy and maintains that "therapy will remain a constant and important part of this family's existence, [and that she] is committed to making that happen." *Id*. Mother additionally claims that she "has shown that she can, has, and will continue to remedy any causes of the removal of [the C]hildren." *Id*.

_____

[5] We are mindful that, because J.R.S. is now eighteen years old, Mother's appeal of the decree terminating her parental rights to J.R.S. may be moot. As a general rule, an actual case or controversy must exist at all stages of the judicial process, or a case will be dismissed as moot. *In re D.A.*, 801 A.2d 614, 616 (Pa. Super. 2002) (holding that an issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect). Although J.R.S. is no longer a child, this Court will decide questions that otherwise have been rendered moot when one or more of the following exceptions to the mootness doctrine apply: (1) the case involves a question of great public importance; (2) the question presented is capable of repetition and apt to elude appellate review; or (3) a party to the controversy will suffer some detriment due to the decision of the trial court. *Id*. Here, Mother will clearly suffer detriment as a result of the termination of her parental rights to J.R.S. Accordingly, we find the doctrine of mootness is overcome and continue with our analysis.

The trial court explained its finding of grounds for the involuntary termination of Mother's parental rights pursuant to section 2511(a)(2) as follows:

[J.R.S.] was removed from her parents' care on November 10, 2019. [J.D.S.] followed on July 31, 2020. Neither parent was able to provide appropriate care and control in either instance. Both individually and as a couple, their lives were defined by anger and hostility. Unable to control even themselves, they were certainly incapable of controlling [the C]hildren, who quite naturally absorbed and regurgitated the ugliness surrounding them.

Since the beginning of the [C]hildren's dependency, Mother and Father have sought to blame one another for the conditions that led to their removal and prevented their return. Father did so repeatedly throughout the [C]hildren's dependency proceedings, and Mother confidently proposed even at the termination hearing that she and the [C]hildren could mend their relationships now that Father was not around to interfere. She continued to portray him as the guilty party and herself as the victim of circumstances. While voicing the concession that some of her actions may have contributed to the [C]hildren's trauma, moreover *e.g.*, threatening to kill herself in front of [J.D.S.] and staying with Father after [J.R.S.] asked her to leave him, Mother stopped far short of demonstrating actual self-awareness or a sense of personal responsibility in that regard.

Notably, Mother's solution to challenging termination and regaining custody of [J.R.S.] and [J.D.S.] was "a lot of therapy." Ignoring the proverbial elephant in the room, however, she said nothing about why the extensive therapy she had received while seeking reunification through the [c]ourt's juvenile division had not already equipped her to leave Father, control her anger, interact appropriately with her children, or otherwise gain the knowledge and skills she needed to become an effective parent. She left the [c]ourt to wonder, therefore, why it should accept the proposition that additional therapy would accomplish any of that. In the absence of evidence that she independently sought additional counselling once it was no longer provided through the Agency, moreover, she left the [c]ourt to wonder whether and how she would obtain "a lot of therapy" now. Even were that to

- 10 -

happen, though, Mother's dependency-related history tells the [c]ourt that reunification could not occur within a reasonable period of time. The span of time necessary to get not just her, but also the [C]hildren to the place where she could regain custody would deny [J.R.S.] and [J.D.S.] even the chance of permanency for far too long, and the [c]ourt will not do that to them based on Mother's unsubstantiated hope that more therapy is the solution here.

Trial Court Opinion, 9/16/21, at 6-7 (footnotes omitted).

Our review confirms that the trial court's findings of fact and credibility determinations are supported by the record. Although Mother was initially compliant with the family service plan goals, Ms. Sallack testified as to Mother's subsequent noncompliance and lack of progress. *See* N.T., 9/2/21, at 20-21. Ms. Sallack stated that, after the June 2020 review hearing, Mother was not compliant with the child permanency plans. *Id*. at 28. Father obtained a PFA order against Mother in July 2020, which initially included J.D.S. *Id*. at 19, 21, 27-30. Mother violated the PFA order and was incarcerated from July 2020 to October 2020. *Id*. at 20-21, 28-29, 40-41, 44, 72. Noting Mother's incarceration, Ms. Sallack confirmed that there was no compliance at the time of the goal change in September 2020. *Id*. at 23. Ms. Sallack likewise noted that there was no progress since July 2020, which continued after the goal change in September 2020 and Mother's release from incarceration in October 2020. *Id*. at 29, 39-40. Ms. Sallack explained that services were stopped prior to the goal change due to Father's aggressive behavior toward the Agency and service providers, as well as Mother's incarceration, as certain services were not permitted in the correctional

facilities due to the COVID-19 pandemic. *Id*. at 40. Based on the above, Ms. Sallack testified, "[i]t is the [A]gency's position that the parental rights of [Mother] and [Father] be terminated and the [C]hildren be free for adoption." *Id*. at 36. This evidence substantiates the trial court's determination that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused the Children to be without essential parental control or subsistence necessary for their physical and mental well-being and that despite ample opportunity, Mother cannot or will not remedy this situation. As we discern no error of law or abuse of discretion, we affirm the trial court's finding of sufficient grounds to involuntarily terminate Mother's parental rights to Children under section 2511(a)(2).[6]

Decrees affirmed.

President Judge Panella joins the memorandum.

Judge Olson concurs in the result.

_____

[6] As the record supports the trial court finding of grounds for termination of Mother's parental rights to the Children under section 2511(a)(2), we need not address Mother's second and third issues which challenge the trial court's findings pursuant to section 2511(a)(5) and (8). *See In re B.L.W.*, 843 A.2d at 384 (explaining that we need only agree with the trial court's determination as to any one subsection of section 2511(a) in order to affirm the termination of parental rights).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  6/29/2022