J-S14032-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF G.A.S., JR. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: G.S., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1501 WDA 2021 |

Appeal from the Order Entered November 17, 2021
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  118-2019

| | | |
|---|---|---|
| IN RE: ADOPTION OF A.M.S. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: G.S., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1502 WDA 2021 |

Appeal from the Order Entered November 17, 2021
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  No. 119 of 2019

BEFORE:  McLAUGHLIN, J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED:  June 6, 2022**

In these consolidated cases, G.S., Sr. (Father) appeals from the orders

entered in the Court of Common Pleas of Westmoreland County (orphans'

court) involuntarily terminating his parental rights to his son, G.A.S., Jr., born

in November 2013 and his daughter, A.M.S., born in June 2017 (Children) as

_____

[*] Retired Senior Judge assigned to the Superior Court.

well as changing their goal from reunification to adoption by their maternal grandparents, D.H. and L.H. (Grandparents).[1] We affirm.

**I.**

The relevant facts and procedural history of this case are as follows. The Westmoreland County Children's Bureau (the Agency) became involved with the family after a March 2018 report that Mother had left A.M.S. unattended in a vehicle for 30 to 45 minutes. At that time, Father was incarcerated on charges of strangulation, terroristic threats and simple assault against Mother as well as drug possession.[2] Mother had criminal charges pending against her as well including endangering the welfare of a child and drug offenses.

Following a hearing, Children were adjudicated dependent in September 2018 and placed in the home of Grandparents where they continue to reside. Multiple permanency review hearings were held to assess the ability of Father and Mother to care for Children and they were found to have demonstrated minimal compliance and little progress. In November 2019, the Agency filed a petition seeking termination of their parental rights to Children, but the

---

[1] The court also terminated the parental rights of L.D.S. (Mother). She has not filed an appeal.

[2] Father was subsequently convicted of and/or awaiting trial on several additional offenses at the time of the hearings.

proceedings were continued due to Covid-19 issues and Mother's brief signs of progress towards reunification.[3] The Agency refiled the termination petition in March 2021.

**A.**

The orphans' court held a two-day hearing on the petition on July 15 and November 4, 2021. Caseworker Melissa Lofts had worked with the family since August 2019 and testified that Father's drug/alcohol and mental health evaluations resulted in diagnoses of alcohol, cocaine and opioid dependance, generalized anxiety disorder and post-traumatic stress disorder. (*See* N.T. Hearing, 11/04/21, at 290, 293-94, 299). Father has been prescribed medications including anti-psychotics and anti-depressants to treat these conditions. Although Father completed inpatient and outpatient substance abuse treatment programs, his prognosis is "guarded." (*Id.* at 295). After Father completed treatment, drug screens showed three positive results for cocaine. (*See id.* at 298). Father did not complete mental health treatment.

Ms. Lofts testified that Father and Mother were initially provided with parenting services but those services were terminated after "threatening and degrading comments to the providers, concerns for illegal drug abuse and

---

[3] We note that in of January 2021, the orphans' court found that the Agency had not made reasonable efforts to finalize permanency plans for Children during a two-month period while Father was incarcerated around the end of 2000. However, that order was amended shortly thereafter to reflect that the Agency had made reasonable efforts leading up to that time.

intoxication during visits [in addition to] physical discipline being used." (***Id.*** at 301). Subsequent parenting services were likewise unsuccessful because Father and Mother were "resistant to even the most basic hands-on instructions" and Father fell asleep during visits. (***Id.*** at 308). The visits were determined to be detrimental to Children and were not effective in achieving the goal of fostering a familial bond.

Ms. Lofts further testified that Father had been incarcerated for more than 15 months out of the 38 months that Children were the Agency's custody. (***See id.*** at 314). In her assessment, Father failed to acknowledge the seriousness of the circumstances concerning Children, denied his drug abuse and domestic violence, minimized his criminality and represented that the primary obstacle to reunification was appropriate housing. Ms. Lofts stated that "at every hearing since 2019, father was rated as having no progress and no compliance." (***Id.*** at 328).

Ms. Lofts opined that Father is unable to care for Children and termination and goal change to adoption would best serve Children's best interests because Father continues to be involved in criminal activity and is incarcerated; has demonstrated an inability to remain sober and has not completed domestic violence treatment; does not have adequate housing; and has not established a meaningful relationship with Children. (***See id.*** at 329-333). She stated her belief that adoption by Grandparents is in Children's best interests because they provide a safe, stable home and care for Children

in a consistent manner. Grandparents are the only primary caregivers A.M.S. has ever known and they have served as advocates for G.A.S.'s specialized psychological and behavioral needs by collaborating with medical providers and school administrators. During home visits, Grandparents speak about Children with "great pride . . . [and show] a strong emotional connection" with them. (*Id.* at 339). Ms. Lofts testified that although Children enjoy talking to Father on the telephone, termination of his parental rights would not have any negative impact on Children and Grandparents are amenable to facilitating contact with Father. (*See id.* at 387-88).

Dr. Christine Mahady began working with the family in March 2019 and provided trauma and attachment therapy to G.A.S., who has been diagnosed with unspecified trauma/stress-related disorder, ADHD and a speech disorder. Dr. Mahady testified that over the 2½ years she treated the family, she observed "the secure attachment formed between grandma and [G.A.S. and] one of his main things that calm him down is a hug from grandma." (N.T. Hearing, 7/15/21, at 177). Grandmother is capable of redirecting his behavior and implementing consequences while maintaining his trust and providing him with comfort. Dr. Mahady ascertained that G.A.S.'s fear-based trauma was caused by Father and Mother's domestic violence and substance abuse. During treatment visits, Dr. Mahady addressed G.A.S.'s violent tendencies, such as hitting his sister during tantrums, and she testified that he has made significant progress in that "his tantrums have decreased, his violent

tendencies have decreased, his speech level has increased." (*Id.* at 184). Dr. Mahady observed that Grandmother has shown consistency and self-sacrifice, and that Grandparents meet all of Children's needs, including taking them to medical appointments and extracurricular activities and helping them with schoolwork. Dr. Mahady opined that it would be extremely difficult for G.A.S. to adjust to a caretaker other than Grandparents because he is dependent on routine and has a tendency to "fall back into the fight-or-flight, anxiety, unable-to-calm-down routine" when he experiences change. (*Id.* at 194).

Linda Matson, a therapist who supervised visitation between Father and Mother and Children beginning in October 2019, testified that Father and Mother attended 14 out of 31 scheduled visits in her office and 3 out of 21 parenting sessions. (*See id.* at 117-18). While Father engaged with Children at times, he was ineffective in redirecting them when they "would run throughout the office . . . throwing things, taking shoes off, kicking, biting, scratching." (*Id.* at 120). Father rarely implemented Ms. Matson's suggestions concerning their behavior, and while he tried "time-out," he did so using physical restraint and Ms. Matson "stopped the time-out because I was afraid that one of them was going to be hurt." (*Id.* at 121). Father was frequently distracted during visits by his cell phone and he and Mother often engaged in inappropriate conversations about Father's experiences in jail. Father never showed any commitment to reunification with Children and instead blamed police, Grandmother and the Agency for any obstacles. Father

and Mother did not fulfill any short-or long-term treatment goals in that they failed to refrain from substance abuse; obtain suitable housing; improve their parenting skills or demonstrate an understanding of the impact of their behavior on Children. Ms. Matson unsuccessfully discharged them from treatment in May 2020 due to their lack of participation and compliance. (**See id.** at 134-35).

Following the hearings, the orphans' court issued orders involuntarily terminating Father's parental rights to Children pursuant to 23 Pa.C.S. §§ 2511(a)(2), (8) and (b) and changing their goal to adoption. Father timely appealed and he and the orphans' court complied with Rule 1925. **See** Pa.R.A.P. 1925(a)(2)(i)-(ii).

## II.

## A.

Father's issues on appeal challenge the orphans' court decision to terminate his parental rights to Children and its finding that termination serves Children's best interests.[4] The following legal principles guide our review.

---

[4]

> Our standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial

Section 2511 of the Adoption Act governs termination of parental rights and requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the trial court determines that the parent's conduct warrants termination of his or her parental rights does the trial court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re S.C.*, 247 A.3d 1097, 1103 (Pa. Super. 2021) (citation omitted).

"A child has a right to a stable, safe, and healthy environment in which to grow, and the child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *Id.* (citation omitted). When a parent has demonstrated a continued inability to conduct his life in a manner conducive to providing a safe environment for a child, and the behavior is irremediable as supported by clear and competent evidence, the termination of parental rights is justified. *See id.*

---

court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*Interest of D.R.-W.*, 227 A.3d 905, 911 (Pa. Super. 2020) (citation omitted).

- 8 -

In this case, the orphans' court terminated Father's rights pursuant to Sections 2511(a)(2),(8), and (b), which provide as follows:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>        \*       \*       \*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
>        \*       \*       \*
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
>        \*       \*       \*
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2),(8) and (b).

We are also mindful that "incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing essential parental care, control, or subsistence." ***Int. of K.M.W.***, 238 A.3d 465, 474 (Pa. Super. 2020) (*en banc*) (citation omitted). While incarceration in itself is not sufficient to support termination under any subsection, it does demonstrably impact a parent's capability of performing parental duties and may render him incapable of fulfilling these obligations. ***See id.***

### B.

Father first argues that termination of his parental rights constituted an abuse of discretion because the Agency failed to make reasonable efforts to reunify him with Children. Father contends the Agency did not ensure that he received court-ordered visitation with Children while he was in prison or when he was on parole, and that it neglected to provide him with parenting instruction. (***See*** Father's Brief, at 15-21).

Concerning an agency's reasonable efforts, we have held that although neither § 2511(a) or (b) require a trial court to consider the reasonable efforts an agency provided to a parent before termination of parental rights, the provision of such efforts or lack thereof may be relevant to its consideration of the grounds for termination and the best interests of the children. ***See In Interest of H.K.***, 161 A.3d 331, 337 (Pa. Super. 2017).

In this case, Father cites to **In re T.M.W.**, 232 A.3d 937 (Pa. Super. 2020), to support his claim that the Agency failed to make reasonable efforts to reunite him with Children. However, his reliance on **T.M.W.** is misplaced because the record in that case showed that the parent facing termination "**substantially complied** with her court-ordered Plan" and cooperated with the involved agencies to complete services. **Id.** at 950 (emphasis added).

In contrast, Father has put forth minimal effort at best to cooperate with the Agency's personnel to work towards developing the necessary skills to effectively parent Children. He attended a fraction of the scheduled sessions, and during the visits he did attend, he did not focus on Children because he was absorbed by his cell phone, sleep and Mother. The record belies Father's claim that the Agency did not exercise reasonable efforts to reunite him with Children and, instead, shows that he declined to take advantage of the opportunities offered to him. Father's first issue merits no relief.

## C.

Father next contends the orphans' court erred in finding that termination of his parental rights is in Children's best interests under Section 2511(b). Father points to the successful telephone conversations he has had with Children since August 2021, during which they are happy to speak with him and express their love, as well as his in-person visits with them when he was not incarcerated. (**See** Father's Brief, at 22-24).

In considering Section 2511(b), we are guided by the following tenants:

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

**D.R.-W.**, *supra* at 914 (citations omitted).

Here, the orphans' court explained its reasoning concerning its best interests determination:

Terminating parental rights would be in the best interests of the Children. The minor children have been residing with Maternal Grandparents since September 18, 2018. [A.M.S] barely remembers Father as she was still an infant when removed from the home, although she does enjoy talking to him on the phone. [G.A.S.] requires stability and routine due to his special needs, which is being provided to him. Maternal Grandparents are able to provide [him] with structure to make sure he is properly taking his medications and attending therapy and doctor's appointments. Maternal Grandmother is the appointed educational decision maker for [G.A.S.] and has made sure [he] is getting the help he needs in school. Maternal Grandmother has had [G.A.S.] re-evaluated for his IEP and has kept him active in extracurricular activities, such as soccer, tee-ball and horseback riding. While [his] behavior fluctuates, his behavior has been improving and he is more easily redirected from tantrums. Often times, [G.A.S.] wants affection from Maternal Grandmother to calm down and she

- 12 -

plays a key role in his coping skills as she provided consistency and safety to the Children for over two years. Prior to the Covid-19 pandemic [A.M.S.] was receiving early head start education services in the home of Maternal Grandmother. Both Children have a close bond to Maternal Grandparents and show affection towards them. [A.M.S.] has only known Maternal Grandparents as her parental figures and [G.A.S.] has expressed a desire to contact Father but continue living with Maternal Grandparents 'forever.' Due to [G.A.S.'] special needs, it would be difficult for him to be removed from his current home since he requires routine and consistency to thrive.

(Orphans' Court Opinion, 11/17/21, at 29-30).

We discern no error of law or abuse of discretion in this assessment. As detailed above, Grandparents provide for all of Children's physical and emotional needs, including G.A.S.'s specialized behavioral and psychological issues caused by the domestic violence and substance abuse he was exposed to while he was in the care of Father and Mother. Grandparents have been the only primary caregivers A.M.S. has ever known given her placement with them as an infant. Father has been incarcerated for a substantial portion of the time that Children have been in placement and he continues to have substance abuse issues.

Regarding Father's contact with Children, Grandmother makes sure that Children are available for telephone conversations and even "tells them to tell their dad they love him." (N.T. Hearing, 11/04/21, at 387). In contrast, any in-person visits with Children devolved into chaos because Father was unable or unwilling to redirect Children's challenging behavior, to the point of raising safety concerns. Children are thriving in Grandparents' home and they have

formed a very close bond. Taken together, this evidence supports the orphans' court's decision that termination of Father's parental rights and adoption by Grandparents would best serve Children's needs and welfare. We, therefore, affirm the orders pursuant to Section 2511(b).

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/6/2022