J-S24031-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.G.-V., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 641 EDA 2022 |

Appeal from the Order Entered February 15, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000316-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: N.D.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.G.-V., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 642 EDA 2022 |

Appeal from the Decree Entered February 15, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000621-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: S.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.G.-V., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 643 EDA 2022 |

Appeal from the Order Entered February 15, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000317-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: S.N.M.-V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

:
:
:
APPEAL OF: N.G.-V., MOTHER     :
:
:
:
:
:
:    No. 644 EDA 2022

Appeal from the Decree Entered February 15, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000622-2021

| IN THE INTEREST OF: L.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: N.G.-V., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 645 EDA 2022 |

Appeal from the Order Entered February 15, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000318-2020

| IN THE INTEREST OF: L.H.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: N.G.-V., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 646 EDA 2022 |

Appeal from the Decree Entered February 15, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000620-2021

BEFORE: PANELLA, P.J., LAZARUS, J., and PELLEGRINI, J.[*]

---

[*] Retired Senior Judge assigned to the Superior Court.

MEMORANDUM BY PELLEGRINI, J.:                    **FILED AUGUST 30, 2022**

N.G.-V. (Mother) appeals from the orders and decrees[1] entered in the Court of Common Pleas of Philadelphia County (trial court) granting the petition filed by the Philadelphia Department of Human Services (DHS) to involuntarily terminate her parental rights to N.V. a/k/a N.D.V. (age six; d.o.b. May 2015), L.M. a/k/a L.H.M. (age four; d.o.b. December 2016) and S.V. a/k/a S.N.M.-V. (age two; d.o.b. February 2019) (collectively, Children) pursuant to the Adoption Act, 23 Pa.C.S. § 2511 (a)(1), (2), (5), (8) and (b), and changing their permanency goals to adoption.[2] She argues that she made significant progress toward reunification despite the Covid-19 pandemic and Father's physical abuse. We affirm.

We take the following factual background and procedural history from the trial court's April 26, 2022 opinion and our independent review of the record.

---

[1] We consolidated the cases *sua sponte* on March 23, 2022.

[2] The February 15, 2022 orders and decrees also involuntarily terminated the parental rights of L.M. (Father) to the Children. He has appealed the order at docket numbers 647-652 EDA 2022 and is not the subject of this appeal. He will only be mentioned to the extent necessary to provide a full picture of the pertinent events.

## I.

## A.

DHS became involved with this family in February 2019 when it received a General Protective Services (GPS) report on February 7, 2019, alleging that S.V. and Mother tested positive for marijuana when S.V. was born prematurely at 33 weeks' gestation on February 6, 2019, and Mother admitted she used marijuana during the pregnancy to self-medicate. DHS did not file dependency petitions at the time because it determined the Children were safe in the home. (*See* Petition for Goal Change to Adoption, 10/22/21, Exhibit A, at ¶ c); (Dependency Petitions, 2/27/20, at ¶¶ 5(b), (d)); (N.T. TPR Hearing (N.T.), 2/15/22, at 7, 32-33).

DHS received a GPS report on March 11, 2019, that one-month old S.V. was treated at St. Christopher's Hospital because Father flipped a mattress off a bed on which Mother and S.V. were sitting, resulting in them falling on the floor and a mark to S.V.'s head. Mother told DHS that she and Father had a three-year history of domestic violence from which she had sustained broken bones and bruises and that he also abused N.V. and L.M. An examination at St. Christopher's Hospital revealed that N.V. had multiple linear scars to his back, chest and legs that appeared to be old. After this incident, Mother left the family home she shared with Father and lived with maternal grandmother (MGM) from approximately March 13, 2019, until March 20, 2019. (*See* Petition for Goal Change, Exhibit A, at ¶¶ f-j, m).

On March 25, 2019, Community Umbrella Agency (CUA) Northeast Treatment Center (NET) began providing the family with services. On April 11, 2019, an initial Single Case Plan (SCP) was created. Mother's objectives were to contact the domestic violence hotline; respond to outreach from Women Against Abuse; complete and comply with a Protection from Abuse Order against Father; participate in domestic violence counseling; bring Children to medical and dental appointments; and ensure N.V. attends school. (*See id.* at ¶¶ l, o).

On June 7, 2019, CUA met with Mother at Pathways Shelter where she admitted she was not following shelter rules, which was confirmed by the shelter. Mother moved back into the family home with Father and Children on June 9, 2019. When CUA met with the parents and Children, it determined that Children were safe at that time. (*See id.* at ¶¶ p, q).

In July 2019, Mother left Children with MGM to attend a month-long Pittsburgh job training program, but she returned to the family home she shared with Father in October 2019. At that time, Mother admitted she recently missed S.V.'s cardiology appointment, and on October 10, 2019, she overslept and missed the rescheduled appointment. (*See id.* at ¶¶ r-u).

Mother and Children again left the family home to reside with MGM on December 8, 2019, due to Father's physical abuse. CUA met with Mother at MGM's home on December 9, 2019, and she was unable to provide proof of employment and had not enrolled Children in daycare and preschool, and was

not attending parenting classes or addressing Children's behavioral problems. CUA recommended that Mother obtain substance abuse treatment but she refused. (***See id.*** at ¶ w).

On February 3, 2020, Mother admitted to missing her scheduled parenting class. When CUA informed her that she had a February 7, 2020 intake appointment at NET for drug and alcohol treatment, Mother said she did not need to attend. (***See id.*** at ¶¶ x-z).

**B.**

On February 27, 2020, DHS filed urgent dependency petitions as to all Children. At the March 11, 2020 adjudicatory hearing, the trial court adjudicated them dependent and directed DHS to supervise their care. The court ordered that Children remain with Mother, with supervised visits by Father. The court referred Mother to the Clinical Evaluation Unit (CEU) for drug and alcohol screens, dual diagnosis assessments and three random drug screens prior to the next court date. She also was referred to the Achieving Reunification Center (ARC) for parenting, housing and domestic violence counseling, and to Behavioral Health Services (BHS) for a consultation/evaluation. CUA was ordered to obtain an Order of Protective Custody if Mother left MGM's home with Children. (***See id.*** at ¶ aa); (Order of Adjudication and Disposition, 3/11/20).

On March 25, 2020, DHS learned that Mother had left MGM's home with L.M. and N.V. three days before. She left S.V. in MGM's home under the care

of the maternal aunt and uncle. When CUA visited MGM's home on March 26, 2020, it noted that Mother had returned and Children appeared safe. (Petition for Goal Change, Exhibit A, at ¶¶ bb, cc).

On March 31, 2020, CUA learned Mother had left MGM's home again and that Children were in maternal aunt and uncle's care. On April 1, 2020, CUA determined Children were safe and a Safety Plan was implemented. CUA spoke with Mother on May 12, 2020, but she refused to disclose her location. On May 20, 2020, DHS learned that Mother had returned to MGM's home and attempted to remove Children to take them to New Jersey. CUA and DHS attempted to place Children with maternal aunt and uncle, but it was determined that uncle was not an appropriate caregiver, and they unsuccessfully attempted to locate kinship placement. (*See id.* at ¶¶ dd-hh).

On May 21, 2020, DHS filed an application for emergency protective custody for the Children, and on May 22, 2020, the court held a shelter care hearing at which it lifted the temporary order of protective custody and fully committed Children to DHS. Children were placed in separate foster homes through Bethany Children's Services. Mother was ordered to attend virtual visitation. (*See* Recommendation for Shelter Care/Order, 5/22/20); (Petition for Goal Change, Exhibit A, at ¶¶ ii, jj).

## C.

Permanency review hearings were regularly held at which DHS was found to have made reasonable efforts to finalize the permanency plan.

Mother appeared at a May 2020 shelter care hearing but did not appear in court again until the August 2021 hearing.

On June 17, 2021, a revised SCP was created. Mother's parental objectives were:

1. Participate in domestic violence counseling;

2. Attend ARC for parenting classes;

3. Attend ARC for housing resources and services;

4. Have weekly visitation with Children;

5. Enroll in dual diagnosis program and complete random screens;

6. Enroll in drug and alcohol treatment;

7. Have a drug screen;

8. Have regular visits with CUA with telephone and/or home visits at least bi-weekly.

(**See** Petition for Goal Change, Exhibit A, at ¶ mm).

Mother was found to be non-compliant with both the initial and revised SCP plans at the permanency review hearings and was not making progress toward reunification. (**See** Permanency Review Order, 10/15/20); (Recommendation—Permanency Review/Order, 4/15/21); (**See** Recommendation—Permanency Review/Order, 8/12/21); (**See** Petition for Goal Change, Exhibit A, at ¶¶ kk, ll, nn).

**D.**

On October 22, 2021, DHS filed separate petitions to terminate the parental rights (TPR) of Mother and Father and change Children's goals to

adoption because Mother and Father had failed to achieve any SCP objectives, which had been explained to them on more than one occasion by both DHS and the trial court. The court held a hearing on February 15, 2022. Ms. Ahmani Quarles testified as the representative of CUA. Mother testified on her own behalf.

**1.**

In addition to the foregoing facts, Ms. Quarles testified that at the time of the hearing, N.V. was six years old, L.M. was five years old and S.V. was three years old. She explained that S.V. had a heart murmur, and that Mother had either forgotten or missed several cardiology appointments while she was in her care. When Ms. Quarles spoke to Father about the missed appointments, Father stated that it was Mother's responsibility to handle them. (*See* N.T., at 34, 46).

She stated that Mother was made aware of her SCP objectives throughout the life of the case and never told Ms. Quarles she was having any difficulty meeting the goals. Despite this, Mother was essentially non-compliant with her drug and alcohol objectives. Although she was referred for three random drug screens at every court date, she only attended one random screen in 2021 and had tested positive for marijuana. The trial court had ordered a dual diagnosis assessment at the March 2020 adjudicatory hearing and at each hearing thereafter, but Mother did not attend an assessment until

January 2022, approximately three months after the TPR petitions had been filed. (**See id.** at 9-11, 37).

Ms. Quarles testified that although CEU was closed for a period during the Covid-19 pandemic, NET remained open for random drug screens and treatment. Mother had been referred to a drug and alcohol program at NET Frankford, but she had not enrolled at the time of the hearing. She had an intake appointment scheduled for the day after the hearing. (**See id.** at 10-11, 49-50).

Mother also failed to comply with her ARC objective. Ms. Quarles had referred Mother approximately five times for parenting and housing classes, which Mother would start attending, but then stop. She never provided an explanation for the non-compliance. Mother had also been referred for a domestic violence consultation through Women Against Abuse, but she never attended, despite expressing a willingness to do so. On cross-examination, Ms. Quarles testified that ARC did not shut down during the Covid-19 pandemic, instead offering virtual classes that she set up for Mother. (**See id.** at 11-13, 50-51).

A few months prior to the hearing, Mother told Ms. Quarles that she was employed at Dunkin' Donuts but did not provide any pay stubs. Ms. Quarles had requested documentation of employment and income throughout the life of the case since it was one of Mother's SCP objectives. (**See id.** at 14, 53).

According to Ms. Quarles, Mother is currently living on the third floor of a rooming house with a new baby, her paramour (the baby's father) and her paramour's mother. The third floor contained two bedrooms and had appliances, including a refrigerator, toaster oven and microwave, which Ms. Quarles said posed a safety issue. (N.T., at 52-53). Other residents lived on the second floor, where Mother's family shared a kitchen. Ms. Quarles testified that the home was not appropriate for reunification. (*See id.* at 13-14, 52).

In May 2020, the Children were placed in separate foster homes, which were adoptive resources. When Mother's attorney asked Ms. Quarles if she believed the Children were unsafe prior to their removal, Ms. Quarles responded that she always feared they were unsafe, but she was not able to prove it because they were too young to express if that was how they felt. (*See id.* at 8-9, 54-55).

According to Ms. Quarles, Mother attended nine visits with the Children over the life of the case, mostly after the dependency and TPR petitions were filed, despite the court's order for weekly supervised visits at the agency. When Ms. Quarles asked Mother in 2021 why she was not seeing Children, Mother responded that she did not know. Ms. Quarles testified that the visits that did occur were quiet, with Mother mostly taking pictures of Children. Children call Mother by her first name, even though they know that she is their mother. They give her a "light hug" during the visits, but they do not indicate that they miss her. Ms. Quarles did not observe a parent-child bond

between Mother and Children, who did not cry when leaving Mother after the visits, instead running to their foster parents and hugging them. (*See id.* at 14-18).

Children rely on their foster parents to meet their needs, are thriving and happy, share a parent/child bond with them and refer to them as "mom" and "dad." Ms. Quarles opined that she did not believe that Children have a parent/child relationship or bond with Mother, that they would not suffer irreparable harm if her parental rights were terminated, and that it would be in their best interests to terminate her parental rights so they were eligible for adoption. (*See id.* at 18-19, 29-30, 40-41, 56).

The trial court found that Ms. Quarles was "credible and accorded great weight" to her testimony. (Trial Court Opinion, 4/26/22, at 14).

**2.**

Mother testified on her own behalf. When asked on direct-examination about her "somewhat limited visits," Mother said that the links provided by CUA for virtual visits in 2020 sometimes would not work and that some visits were cancelled without being made up. When the visits returned to in-person later in 2020, Mother testified that only L.M. and S.V. would be there, with N.V. being either late or absent. She admitted that sometimes she cancelled the visits or forgot to confirm them and did not identify how many she attended. (*See id.* at 75-77).

Mother testified that she would talk to and interact with the Children at the visits, asking them about school and their siblings, and that the visits went well. Although she said the Children called her "mommy," she later admitted that sometimes they called her by her first name. She contended that L.M. and N.V. would ask to come home with her at the end of visits and that she would tell them, "very soon." (*Id.* at 76-77).

She acknowledged that she has tested positive for marijuana but stated she did not attend any drug and alcohol programs because she did not need to go, despite CUA having told her that attendance was one of her objectives for reunification. She asserted that she had an intake appointment for drug and alcohol treatment scheduled for the day after the hearing at NET Frankford. (*See id.* at 79, 82-83).

Mother said she "kept reaching out to" ARC for parenting classes, and that she was supposed to start the previous Tuesday, but never received their email about it and, when she called ARC, they told her she was not in the system (*Id.* at 83). Mother stated that she kept CUA informed of what was happening in her life.

As to housing, Mother testified that she did not reside in a rooming house, but instead that it was her paramour's father's home and that her paramour's brother had moved out so no one lived on the second floor. She said that despite the CUA case manager evaluating the house monthly, she did not evaluate the kitchen, living room or dining room because she did not

want to see them and did not evaluate the first and second floors despite entering the home on the first floor. Finally, Mother testified that she had been working at Dunkin' Donuts for approximately four months and that the CUA case manager did not ask for pay stubs. (**See id.** at 74, 79, 80-82).

The trial court found Mother's testimony to be "unconvincing and self-serving." (Trial Ct. Op., at 13).

**3.**

At the conclusion of the hearing, the trial court entered an order finding clear and convincing evidence supported involuntarily terminating the parental rights of Mother pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b). Mother timely appealed and filed a contemporaneous statements of errors.[3] **See** Pa.R.A.P. 1925(a)(2)(i).

_____

[3] We review the trial court's order for an abuse of discretion. **See In re G.M.S.**, 193 A.3d 395, 399 (Pa. Super. 2018) (citation omitted). Moreover, "[w]e give great deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." **In re Interest of D.F.**, 165 A.3d 960, 966 (Pa. Super. 2017). "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." **In re S.H.**, 879 A.2d 802, 805 (Pa. Super. 2005). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." **In re A.S.**, 11 A.3d 473, 477 (Pa. Super. 2010). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." **Id.**

## II.

## A.

The trial court terminated Mother's parental rights pursuant to Section 2511(a)(1),(2), (5), (8) and (b) of the Adoption Act, which provide:

**(a) General rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement

of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b).

It is well-settled that "[w]e need only agree with [the trial court's] decision as to any one subsection of Section 2511(a) and subsection (b) in order to affirm the termination of parental rights." **Int. of K.M.W.**, 238 A.3d 465, 473 (Pa. Super. 2000) (citation omitted). For the following reasons, we conclude that the trial court correctly determined that DHS met its burden of proof under subsections 2511(a)(2) and (b).

**B.**

Mother argues that the trial court erred in finding that DHS produced clear and convincing evidence to support the termination of her parental rights. We first address the court's termination of Mother's parental rights pursuant to Section 2511(a)(2). **See Int. of K.M.W.**, **supra** at 473.

In a termination proceeding, the moving party must produce clear and convincing evidence with respect to the following elements to terminate parental rights pursuant to Section 2511(a)(2): (1) repeated and continued

incacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Pursuant to Section 2511(a)(2), parents are "required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *In re J.R.E.*, 218 A.3d 920, 925 (Pa. Super. 2019) (citation omitted). "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *See id.* (citation omitted). "The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity that cannot be remedied are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021) (citation omitted).

In the instant case, the trial court explains:

> The Children were adjudicated dependent on March 11, 2020. The record and testimony presented at the February 15, 2022 Termination Hearing demonstrated Mother's … ongoing inability to provide care for or control of the[] Children. [Her] failure to remedy the conditions that brought the Children into care indicated a continuing disregard for [her] parental duties. Specifically, Mother failed to provide suitable housing for her Children, refused to submit to [c]ourt ordered drug testing by

urinalysis as scheduled, and failed to visit her Children on a regular basis. The Children were adjudicated dependent in 2020. Since then Mother refused or proved unable to address her substance abuse and mental health problems. This was despite constant recommendations from CUA and the trial court to obtain a dual diagnosis evaluation. … The trial court noted that all the Children were placed in foster care. The trial court prefers not to keep siblings separate but the testimony and evidence indicated that the Children and their respective caregivers shared a parental bond and their respective caregivers were providing for the Children's daily emotional and physical needs. In contrast, the [c]ourt found that Mother … lacked the capacity to address the[] Children's basic emotional and physical needs. Consequently, documents and testimony presented at the termination hearing provided the trial court clear and convincing evidence to terminate Mother's … parental rights and rule that the termination of these rights would be in the best interest of the Children pursuant to 23 Pa.C.S.[] §§ 2511(a)(1), (2), (5), (8) and 23 Pa.C.S.[] § 2522(b).

(Trial Ct. Op., at 11-12) (footnotes omitted); (*see id.* at 14-15).

Mother argues that DHS did not meet its burden under Section 2511(a)(2) because she was active at her visits with Children, had or was working toward completing some of the SCP objectives like drug and alcohol treatment, housing, employment and domestic counseling. (*See* Mother's Brief, at 27). She claims that she has "made every effort" to comply with her SCP objectives and address the issues that resulted in the Children being placed in foster care and was limited by the Covid-19 restrictions and domestic violence. (*Id.* at 20).

The record belies Mother's argument where it reflects that DHS provided clear and convincing evidence to support termination of Mother's parental rights. It is undisputed that DHS became involved with the family in February 2019 when S.V. was born with marijuana in her system, and the Children have

been in placement since May 2020 due to the domestic violence in the home and Mother's continued refusal to comply with her SCP goals and the trial court's orders, resulting in her inability to remedy the situation.

For example, Mother admittedly was aware that she needed to meet her drug and alcohol objectives, including dual diagnosis assessment, treatment and screens, and the trial court ordered her to comply at each permanency review hearing, but she did not attend. (**See** N.T., at 9-11, 79). Mother willingly failed to do anything toward meeting any drug and alcohol-related objectives for approximately two years from when the Children were put in placement until attending a dual diagnosis assessment in January 2022 and scheduling an intake appointment for the day after the TPR hearing. (**See id.** at 10, 79, 82). She claimed she failed to complete her drug and alcohol objectives because she believed she did not need any treatment, not because either the Covid-19 pandemic or domestic violence rendered her unable to attend. (**See id.** at 77, 79).

Additionally, Mother failed to attend ARC and there is no indication it was due to any limitations caused by either the Covid-19 pandemic or the domestic violence between her and Father. Ms. Quarles testified that she referred Mother to ARC approximately five times and that, over the life of the case, Mother would start attending programs but stop. (**See id.** at 12). Even during the Covid-19 pandemic, Ms. Quarles would arrange for virtual classes, but Mother would not attend them. (**See id.** at 50-51). Ms. Quarles testified

that Mother never engaged in domestic violence classes and did not explain why she failed to do so. (*See id.* at 12-13). Indeed, Mother did not testify about the domestic violence objective at all. (*See id.* at 76-84).

Ms. Quarles and Mother offered conflicting testimony about the status of the home in which she lived, with Ms. Quarles calling it an unsafe rooming house and Mother describing it as an appropriate single-family home. (*See id.* at 14, 52, 79-82). The court found Ms. Quarles wholly credible and Mother to be "unconvincing and self-serving." (Trial Ct. Op., at 13-14). In fact, in conflict with her testimony that the home was a suitable single-family home, Mother now claims in her brief that she was "actively looking for suitable housing, but was, understandably, having little success due to COVID-19's effect on the housing market." (Mother's Brief, at 21). Mother did not testify that she was struggling to find housing because of the Covid-19 pandemic or that she was actively seeking alternative housing where her claim was that the home she was in was appropriate.

Critically, Mother failed to comply with the trial court's orders that she attend weekly visitation with the Children, with Ms. Quarles credibly testifying that Mother saw them only nine times in nearly two years, with most of the visits being after the dependency and termination petitions had been filed. (*See* N.T., at 15-16). Mother told Ms. Quarles that she did not know why she had missed so many visits but testified it was because of technical issues related to virtual visits and cancellations of in-person visits due to illnesses of

the Children and their caregivers. (*See id.* at 75-76). She offered no clear explanation for the failure to attend makeup visits and admitted that she caused some of the missed visits by cancelling or forgetting to confirm them. (*See id.* at 77); (Trial Ct. Op., at 13).

Based on the foregoing, the record belies Mother's claims about difficulties caused by the Covid-19 pandemic and domestic violence. DHS provided clear and convincing evidence that due to Mother's continued incapacity, she is unable to provide Children with the essential care necessary for their physical and mental well-being. The trial court did not abuse its discretion in finding that DHS presented sufficiently clear and convincing evidence to support termination based on Section 2511(a)(2).

**C.**

Having determined that the court properly found that termination of Mother's parental rights was appropriate under subsection 2511(a)(2), we now consider whether termination is in Children's best interests pursuant to subsection 2511(b).

> With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. In particular, we review whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. It is well settled that intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child.
>
> One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, with close attention paid to the effect on the child of permanently severing any such bond. The fact that

- 21 -

a child has a bond with a parent does not preclude the termination of parental rights. Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. Notably, where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists.

It is sufficient for the trial court to rely on the opinions of social workers and caseworkers when evaluating the impact that termination of parental rights will have on a child. The trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

*Int. of K.M.W.*, *supra* at 475 (case citations and most quotation marks omitted).

Mother maintains that DHS failed to present any evidence about whether a bond existed between her and Children, but that evidence did exist that they were safe with her.[4] (*See* Mother's Brief, at 30). She argues that "the evidence clearly indicates [she], even during the COVID-19 pandemic made every effort to develop and maintain [a] parent-child relationship with her Children." (Mother's Brief, at 30).

Ms. Quarles testified that Children call Mother by her first name and are excited to return to their foster parents after the visits. (*See* N.T., at 17-19, 39-40); (Trial Ct. Op., at 13). All the foster parents are adoptive resources.

_____

[4] While the CUA did find at some of the home visits that Children were safe, Ms. Quarles testified that she felt that they were unsafe since she became involved with the family but was unable to prove it because Children were too young to express this and she did not see bruises. (*See* N.T., at 55). It was within the province of the trial court to weigh this fact against the rest of the evidence produced.

(**See** N.T., at 29). Children refer to their foster parents as "mom" and "dad" and consider the parents' family to be their own. (**See id.** at 18-19, 39-40). N.V. has expressed a wish to be adopted by the foster parents. (**See id.** at 56). The foster parents take Children to their appointments and provide for their needs and welfare. (**See id.** at 29). Ms. Quarles testified that Children are happy and healthy and have parent/child bonds with their foster parents. She expressed that termination of Mother's parental rights would not cause irreparable harm to Children and it was in their best interests to do so and change their goals to adoption. (**See id.** at 29-31, 40-41).

Hence, the record supports the trial court's finding that the evidence and DHS testimony established that the termination of Mother's parental rights would best serve Children's interests pursuant to Section 2511(b) and we find no abuse of discretion in its decision to terminate Mother's parental rights to Children and change their goals to adoption.

Orders and decrees affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/30/2022