J-S30032-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: K.R., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.S, MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 814 MDA 2024 |

Appeal from the Order Entered May 28, 2024
In the Court of Common Pleas of Lycoming County Orphans' Court at
No(s): 2023-6857

| | | |
|---|---|---|
| IN RE: A.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 815 MDA 2024 |

Appeal from the Order Entered May 28, 2024
In the Court of Common Pleas of Lycoming County Orphans' Court at
No(s): 2023-6858

BEFORE:   PANELLA, P.J.E., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:     **FILED: SEPTEMBER 30, 2024**

J.S. ("Mother") appeals the order of the Court of Common Pleas of

Lycoming County that involuntarily terminated her parental rights to her

biological daughters: K.R., born in March 2011, and A.S, born in August 2018

---

[*] Former Justice specially assigned to the Superior Court.

(collectively "Children").[1] After careful review, we affirm the order involuntarily terminating Mother's parental rights.

We gather the relevant factual and procedural history of this matter from the certified record. When Dauphin County Social Services for Children and Youth ("the Agency") became involved in Mother's life, Mother lived with her two daughters along with her husband, A.S.'s father, who also has the initials A.S. K.R.'s father, who also has the initials K.R., has had minimal involvement in his daughter's life due to addiction issues.

In December 2021, Mother initiated a Child Protective Services (CPS) report by notifying police that she had discovered sexually explicit photos of K.R.'s vaginal area and buttocks on A.S.'s father's phone; the photos appeared to have been taken while K.R. was sleeping. Notes of Testimony (N.T.), 10/11/23, at 105-110. Mother also found inappropriate text messages A.S.'s father sent to K.R. Term. Petition (K.R.), at 4. Mother also reported that when she confronted A.S.'s father, he punched her in the face, put a gun to her head, and threatened to kill her. Term. Petition (K.R.), at 4.

Although Mother made this initial report to the police, Mother was not cooperative with the Agency's subsequent investigation into the matter, claiming that she had overexaggerated and misinterpreted the incident which

_____

[1] In the order docketed at case 2023-6857, the orphans' court also terminated the parental rights of K.R.'s biological father, who also has the initials K.R. In the order docketed at case 2023-6858, the orphans' court also terminated the parental rights of A.S.'s biological father, who also has the initials A.S. Neither father appealed the orphans' court's termination order.

she characterized as an "accident." N.T., 10/11/23, at 109. Mother indicated that A.S.'s father told her that K.R. took the explicit photos of herself on her phone and A.S.'s father transferred them onto his phone in order to tell Mother. Term. Petition (K.R.), at 4. Thereafter, Mother refused to allow the Children to be interviewed by the Children's Advocacy Center (CAC) and prohibited the Agency from entering her residence for a home visit. N.T., 10/11/23, at 109-118.

In addition, the Agency received reports that K.R. had not been attending the cyber school that she was enrolled in and discovered that her computer was broken. N.T., 10/11/23, at 111-12; Term. Petition (K.R.), at 4. The Agency reported that there have been truancy issues dating back to 2019 for Mother's failure to ensure that K.R. was attending school consistently. Term. Petition (K.R.), at 4. Further, a parent of one of the Children's friends reported to the Agency that she had found that Mother had left the Children unsupervised while she had passed out as a result of her intoxication. The parent sent the agency photos of Mother's home, showing the residence was in a deplorable condition. N.T., 10/11/23, at 111-12.

Thereafter, as Mother continued to refuse the Agency's requests for home visits, the Agency sought and obtained permission to compel entry into Mother's home with the assistance of law enforcement. After the Agency determined that the Children were not safe with Mother due to the condition of her residence, Mother requested that the Children be permitted to stay with K.S., the paternal aunt of A.S. ("Paternal Aunt"). N.T., 10/11/23, at 118.

On January 23, 2022, Mother requested for Children to be returned to her care, averring that A.S.'s father was no longer in the house. Term. Petition (K.R.), at 4. The Children were returned to her care as a dependency petition had not yet been filed. N.T., 10/11/23, at 118. On a subsequent home visit, the Agency discovered that Mother had allowed A.S.'s father to come back into her home. N.T., 10/11/23, at 119-20.

On January 28, 2022, the Agency filed a dependency petition for both children. After the orphans' court held a hearing, the Children were adjudicated dependent on February 11, 2022. The Children were placed with the Agency for their legal and physical custody; the Agency arranged for the Children to be placed in the care of A.S.'s paternal grandparents. N.T., 10/11/23, at 123. Thereafter, Paternal Aunt moved in with Paternal Grandparents' home to assist with the Children's care and indicated that she would be an independent placement resource for Children once she was able to obtain adequate housing. N.T., 10/11/23, at 38.

At the dependency hearing, Mother, K.R.'s father, and A.S.'s father were given drug tests and all three parents tested positive for controlled substances. N.T., 10/11/23, at 123. Mother, K.R.'s father, and A.S.'s father, were ordered to obtain drug and alcohol assessments, submit to random drug testing, undergo a psychological assessment, and to engage with Outreach Services for assistance with housing, parenting, and budgeting. N.T., 10/11/23, at 126.

Mother never completed the court-ordered drug and alcohol assessment and did not undergo a psychological assessment. N.T., 10/11/23, at 142-43. When Mother did not seek assistance from Outreach Services, her services were closed and she did not make a request for her case to be reopened. N.T., 10/11/23, at 142-43. With respect to the drug screens, Mother only participated in screens given at court sessions. N.T., 10/11/23, at 143. After her initial positive drug test at the dependency hearing, Mother repeatedly tested positive on multiple occasions for methamphetamines, amphetamines, fentanyl, and other controlled substances. N.T., 10/11/23, at 143-44.

With respect to visitation, Mother was granted two weekly supervised visits with the Children after they were adjudicated dependent. N.T., 10/11/23, at 22. After Mother failed to appear for visitation on multiple occasions in which the Children had already arrived and were waiting for Mother, the Agency required that Mother check-in with the agency at various times on the date of visitation to confirm she would attend the visit. N.T., 10/11/23, at 23-24. Mother continued to struggle with being timely with appointments even when required to submit to call-in status. N.T., 10/11/23, at 22.

In November 2022, the Agency permitted Paternal Aunt to take custody of the Children in the home she had renovated. N.T., 10/11/23, at 125. Children have remained with Paternal Aunt since that date. N.T., 10/11/23, at 125. Mother continued to live with A.S.'s father after the Children were adjudicated dependent and has denied the Agency access to her home. N.T.,

10/11/23, at 125, 138-39.  The Agency reported that Mother's landlord was granted a money judgment against her on July 6, 2023 and was pursuing eviction.  N.T., 10/11/23, at 140.

On March 2, 2023, the Agency filed a petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).  The orphans' court held a termination hearing on October 11, 2023, at which time K.R. was twelve years old and A.S. was five years old.[2]  Therein, the Agency adduced testimony from, *inter alia*, K.S. ("Paternal Aunt") as well as Agency caseworkers Tammy Reeder and Colleen Bolten.  Mother was represented at the hearing by counsel and also testified on her own behalf.

The orphans' court left the record open to allow for the completion of a bonding assessment.  Thereafter, the orphans' court held an additional hearing on January 17, 2024 at which Dr. Denise Feger, Ph.D. testified as to her bonding assessment of Mother and the Children.

In two separate orders entered May 28, 2024, the orphans' court involuntarily terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8), and (b).  On June 5, 2024, Mother filed timely notices of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).  On June 17, 2024, this

---

[2] Angela Lovecchio, Esquire, served as Children's guardian *ad litem* during the termination hearing and advocated in their best interests.  Johanna Berta, Esquire, served as the Children's legal counsel during the termination hearing. N.T., 10/11/23, at 2-4.

Court entered an order consolidating the cases *sua sponte* pursuant to Pa.R.A.P. 513.

Mother raises the following issues in her appellate brief:

Whether the trial court erred in terminating Mother's parental rights because the best interests of the child are not served by termination and because Mother did not demonstrate a settled purpose to relinquish parental claim to her Daughters.

Mother's Brief, at 7.

Our standard of review in this context is well-settled:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing

as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa.Super. 2022) (internal citations and quotation marks omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Pennsylvania's Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines that the petitioner has established grounds for termination under at least one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). This Court need only agree with the orphans' court's determination as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *Id.*

Our analysis in this case will focus upon Section 2511(a)(2) and (b), which provides as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for

his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

In evaluating whether termination is warranted under Section 2511(a)(2), this Court has determined:

[t]he following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted).

Our Court has held that "[t]he grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal[,] as well as incapacity to perform parental duties." *In re S.C.*, 247 A.3d 1097, 1104 (Pa.Super. 2021) (citation omitted).

- 9 -

[W]hen a parent has demonstrated a continued inability to conduct his [,or her] life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified. A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous.

*Id.* at 1105 (citation omitted).

The orphans' court set forth its rationale for finding sufficient grounds for termination under Section 2511(a)(2) as follows:

The [Children have] been in placement since January of 2022, and … [Mother has not] been able to make measurable progress in addressing the incapacities which caused the [Children] to be removed from Mother's care. Despite attempts by Agency caseworkers to connect [her] with beneficial services, [Mother has] displayed an inability or refusal to follow through with actions necessary to address [her] incapacities while simultaneously ensuring that the [Children's] needs would be met consistently and appropriately. In fact, for the majority of this case, Mother has been in complete denial that she has a substance abuse issue, that the [Children] are in foster care, and that she must cooperate with the Agency and comply with Court orders if she wished to be reunited with the [Children]. … This Court finds that [Mother has not] remedied these incapacities within a reasonable amount of time and will likely be unable to remedy them in the future.

Orphans' Court Opinion and Order (O.C.O.) – termination of parental rights with respect to K.R., 5/24/24, at 13-14.[3] In light of this reasoning and the orphans' court's finding that the Children's fathers similarly failed and/or refused to cooperate with their court-ordered goals, the orphans' court

_____

[3] The orphans' court filed two separate opinions terminating Mother's parental rights with respect to K.R. and A.S., containing the same analysis that there were sufficient grounds for termination under Section 2511(a)(2).

- 10 -

determined that the Agency had demonstrated that the parties' repeated and continued incapacity caused the Children to be without essential parental control or subsistence necessary for their physical and mental well-being.

Our review of the record supports the orphans' court's findings. We are similarly troubled by Mother's failure to appropriately address the discovery of sexually explicit photos her husband took of K.R. Mother's noncompliance with the Agency's investigation and her refusal to allow K.R. to participate in a CAC interview served to essentially shield her husband from any criminal consequences while Mother ignored her duty to protect K.R. from abuse. Mother continued to reside with her husband despite the removal of her Children from her custody. The orphans' court's "serious concerns about Mother's protective capacity" are justified by Mother's choice to protect her husband, rather than her minor daughter.

Similarly, Mother also met the Agency with hostility when caseworkers attempted to establish a home visit to evaluate a report that Mother's home was in a deplorable condition, such that the Agency had to seek court approval to force Mother to allow entry into her home to ensure the Children were safe. Mother was also fined as a result of K.R.'s truancy as K.R. had failed to attend any virtual schooling in the cyber school in which she was enrolled and did not have a working computer. Mother's refusal to ensure that her home was a safe, healthy environment for the Children and her disregard of K.R.'s

educational needs for an education were clearly neglectful of the Children's welfare.

Mother utterly failed to meet her court-ordered goals. Mother refused to undergo drug and alcohol evaluations and psychological assessments. Mother missed numerous random drug testing screens and any screen that she did undergo tested positive for multiple illicit substances on several separate occasions. Mother did not seek help for her substance abuse problem from the Agency or any other program until the date of the termination hearing when she testified that she would get her drug and alcohol evaluation the following day and would comply with any recommendation including inpatient rehabilitation. Given Mother's complete disregard of her nearly all of her permanency plan goals and her refusal to cooperate with the Agency for the previous eighteen months, we agree that Mother's promise is disingenuous and insufficient.

Mother never attempted to comply with her requirement to seek assistance for her home conditions, parenting, or budgeting. Mother failed to secure adequate housing that would allow her to care for the Children. When presented with evidence that her landlord had secured a money judgment of $4,311.18 against her and was granted possession of her residence, Mother blamed her eviction on her husband. While Mother contended that she planned to move into a new three-bedroom trailer, Mother admitted that she had moved into her stepfather's home as the trailer was not yet ready. Mother

has been unemployed during this entire case and has not given the Agency any information on her source of income.

Mother ignores her noncompliance with her family service plan goals and argues that termination of her parental rights is not warranted because she "continued to attend over 50% of her visits [with the Children] with an overall attendance rate of 64%" while she struggled with a substance abuse disorder. Mother's Brief, at 12. Mother asserts that caseworkers admitted that she interacted well with the Children at visits and brought them food and clothing.

In touting her efforts to visit her Children, Mother disregards the fact that Mother was placed on "call-in status" after she repeatedly missed visitation appointments and did not inform the Agency she would not attend. Mother was required to check in with the Agency multiple times on the day of her scheduled visitations to ensure that she would attend and the Children would not be left waiting for her. Due to Mother's inability to visit the Children consistently, Mother never progressed in the frequency, duration, or the level of supervision of her visits.

Mother does not acknowledge that her continued incapacity and/or refusal to meet basic goals for reunification with the Children has caused the Children to be without essential parental care, control or subsistence necessary for their physical and mental well-being. Mother has never made any effort to demonstrate that the causes of her incapacity to parent Children

can be remedied. Based on the foregoing, we discern no abuse of discretion by the orphans' court in concluding Mother's conduct warranted termination pursuant to Section 2511(a)(2).

If a petitioner establishes adequate grounds for termination pursuant to Section 2511(a), we then turn to Section 2511(b), which requires that the court "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Our Supreme Court has generally outlined this inquiry, as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-1106 (Pa. 2023) (internal citations and quotation marks omitted).

The extent, however, of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010) (citation omitted). Rather, it is within the province of the orphans' court to "consider the totality of the circumstances when performing a needs and welfare analysis." *Interest of M.E.*, 283 A.3d at 839 (citation omitted). This Court has clarified that it is "within the discretion of the orphans' court to prioritize the safety and security needs" of children "over their bonds with their parents." *Id.* We will not disturb such an assessment if the orphans' court's factual findings are supported by the record. *Id.*

Further, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *T.S.M.*, 620 Pa. at 629, 71 A.3d at 267. Our Supreme Court has directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 631, 71 A.3d at 269. Specifically, the High Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

In this case, the orphans' court credited Dr. Feger's assessment that while the Children do exhibit bonds with Mother and love her, the Children exhibit unhealthy attachment that is not capable of being repaired in the

current state of the family unit. The orphans' court agreed with Dr. Feger's finding that "Mother's lack of consistent contact as the [Children's] primary caregiver, and the lack of [Mother's] initiative to address her own needs has taken a significant toll on the bond in the eyes of the Child." O.C.O., at 21.

With respect to A.S., who was five years old at the termination hearing, Dr. Feger observed that A.S. "engages in attention seeking behavior, … some of that is a typical response for a child who has been removed from the custody of a caregiver or a parent." N.T., 1/17/24, at 11. Dr. Feger opined that A.S. has developed an "ambivalent attachment" to Mother as A.S. has not had her needs met by Mother consistently, but rather intermittently. N.T., 1/17/24, at 13. Dr. Feger noted that A.S.'s ambivalent attachment to Mother causes her to attempt to monopolize Mother's attention during interactions.

With respect to K.R., who was twelve years old at the termination hearing, Dr. Feger observed that K.R. would make multiple attempts to engage with Mother, which were ultimately unsuccessful, as Mother predominately focused on A.S., who controlled Mother's attention. N.T., 1/17/24, at 11. Dr. Feger opined that K.R. has developed an "avoidant attachment" to Mother in that she has assumed the caregiver role for her younger sister in Mother's absence and minimizes her own needs. N.T., 1/17/24, at 12.

In an interview with Dr. Feger, K.R. admitted that she does not have much confidence in Mother's ability to provide for the Children or to maintain

sobriety, although she wishes Mother was able to be their primary caregiver. N.T., 1/17/24, at 12-13. As such, K.R. explained that she has had to focus on her sister's care for the majority of her life. N.T., 1/17/24, at 13. However, K.R. indicated that her current placement with Paternal Aunt allows her to function in a more age-appropriate role now that she no longer has to be the caregiver for her younger sister. N.T., 1/17/24, at 13.

The orphans' court accepted Dr. Feger's conclusion that neither of the Children's bonds with Mother were healthy nor capable of being repaired given that Mother's needs are largely unresolved and she is "unable to assume the role of a primary caregiver with a level of consistency the can resolve the trauma that undertones the attachment style." N.T., 1/17/24, at 16-17.

Further, the orphans' court emphasized that the Children's physical and emotional needs have been met by Paternal Aunt, who has cared for the girls since they were adjudicated dependent in February 2022. The Children have thrived in the care of Paternal Aunt, who provides a safe, healthy home where there is no concern of domestic abuse or substance abuse. Both girls are enrolled in school and have not had any truancy issues. Paternal Aunt ensures the Children receive appropriate medical and dental care. Further, Paternal Aunt has involved the Children in multiple activities and facilitates communication with Mother at the Children's request so long as the interaction remains respectful.

As the certified record overwhelmingly supports the orphans' court's findings, we discern no error of law or abuse of discretion in the court's conclusion that termination of Mother's parental rights would best serve the Children's developmental, physical, and emotional needs and welfare.

Based on the foregoing, we affirm the orders involuntarily terminating Mother's parental rights.

Orders affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/30/2024